THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN SHIFLET, Defendant-Appellant.

Second District   No. 2—82—0245

Opinion filed June 20, 1984.—Rehearing denied July 20, 1984.

162

G. Joseph Weller and Josette Skelnik, both of State Appellate Defender's Office, of Elgin, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Barbara A. Preiner, Thomas L. Knight, and Diana Fischer-Woods, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NASH delivered the opinion of the court:

After trial by jury defendant, John Shiflet, was convicted of the murder of his wife, Rose Shiflet (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)) and was sentenced to imprisonment for his natural life.

He appeals, contending that the trial court erred: (1) by failing to exclude evidence seized pursuant to a search warrant obtained in violation of defendant's attorney-client privilege; (2) by denying defendant an evidentiary hearing of his assertion that the complaints for two earlier search warrants under which evidence was seized contained false statements; (3) by the admission in evidence of a statement by defendant which the State had failed to disclose prior to trial; (4) by the admission of evidence relating to the victim's blood for lack of foundation and proof of chain of custody; (5) by admission of certain building records without adequate foundation; and (6) by denying defendant due process and equal protection of the law in imposing a sentence of natural life imprisonment.

Rose Shiflet was reported missing by her husband, defendant herein, on the evening of September 30, 1980, and her body was discovered early the next morning in an unincorporated area near Naperville about three miles from the apartment she had shared with defendant in Lisle. She was wearing a shirt and jeans and was bare-

foot; an investigator noted her hands and feet were very clean, there were blood stains on the shirt and a black tar-like substance on the jeans. He then went to the Shiflet apartment complex, where he found a blood-spotted leaf lying next to an automobile identified as belonging to the victim and blood spots on the rear portion of the car and also on the steps leading to the Shiflet apartment.

Officers had a conversation with defendant later that morning when they asked him to relate the events of the previous evening. Defendant stated that when she arrived home from work about 4:45 p.m., his wife was upset over an argument with her father and a kidney infection. They talked for over an hour and he advised her to seek professional help, which she rejected. At about 8 p.m., while they were watching a television movie, he stated she became emotional and threw a glass of iced tea on the floor, saying, "I've got to get out of here"; she then left the apartment. When Rose didn't return, defendant stated he drove around looking for her, then called her sister and brought her to the apartment where decedent's mother later joined them. Defendant stated he called the sheriff's office at 11:30 p.m. to report his wife missing and did so again at 5 a.m., when an officer was dispatched to take a missing person report.

Joan Alleva, decedent's mother, testified defendant called her between 7:30 and 8 a.m. on September 30 and requested that she not call her daughter that evening, as was her custom, because defendant wished to have a serious discussion with Rose without interruption. Defendant also called decedent's sister, Lynda Alleva, at 4:45 that afternoon with the same request.

Lynda Alleva testified she had also received a call from defendant at 10 p.m. on September 30, advising her Rose had been missing since leaving the apartment at 8 o'clock. Lynda told defendant she was coming over, and he at first refused to let her come, but then agreed to pick her up. Defendant arrived at Lynda's home, a 20-minute drive, at 11:10 p.m., saying he had been searching for Rose. On the trip back to defendant's apartment, he told her that Rose had become upset and, after throwing tea on the floor, left, saying she was going to a store for ice cream and would return later. When they arrived at the apartment, defendant went into the bathroom where he remained for quite a while and Lynda could hear water running. When he came out defendant had changed his pants and he then pointed out a wet area on the rug where he said the tea had been spilled.

Joan Alleva came over later and, after calling the hospitals, she and Lynda decided to walk around looking while defendant remained in the apartment by the telephone. As they left the apartment,

defendant advised them to be careful on the stairs as he had slipped and scratched his knuckles on the brick wall. He also told them the scratches and gouges on his arms they had observed were caused when he looked in bramble bushes for Rose.

After walking about the complex for 10 minutes the women returned for the car and found defendant at the rear of it with the trunk open; he then closed the trunk and they all went into the apartment. The women noticed Rose's glasses on a bookcase and were disturbed because she could not see well without them, especially at night. At about 5 a.m. the police were called again, and at 9 a.m. they were informed Rose's body had been found. That evening Joan Alleva saw Rose's body at a funeral home and noticed her fingernails had been cut very short, although she had always worn them long.

Dennis Varhol, the Shiflet's next door neighbor, testified he heard whimpering and hitting noises from the Shiflet's apartment at approximately 8:30 p.m. on September 30 which lasted for several minutes.

An autopsy of decedent's body disclosed a large wound on top of the head which penetrated to the skull. The physician testified such a wound bleeds profusely and as the victim's hair was not contaminated by blood, he concluded it had been washed. The doctor also noticed small scratches on the neck and hemorrhages of the skin of the face and neck. He expressed the opinion the victim died from loss of blood and that at least one-half of the blood volume was absent. The doctor also noted evidence of strangulation, but could not say it contributed to the death. The doctor was unable to take fingernail scrapings from the victim as the nails had been clipped too short, but did remove a tar-like substance from her body and drew two blood samples, one of which he gave to Thomas Duhig, a sheriff's evidence technician who was present at the autopsy.

At about noon on October 1, defendant attempted to remove his wife's car from its parking place near the apartment. When an officer stopped him, defendant stated he was taking it on his attorney's advice, but was not permitted to do so. At 2:30 p.m. that day a vacant apartment below defendant's was searched by officers, who found blood and matted hair in a closet and traces of blood on the bathroom fixtures. On October 1, search warrant No. 3218 was issued by the circuit court authorizing a search of defendant's apartment which was conducted at 5:45 p.m.; a pair of blue jeans and a shirt were seized. The pants were damp, and benzidine tests conducted on stained areas were positive for the presence of blood. On October 2, search warrant No. 3215 was issued authorizing a search of Rose Shiflet's 1980 Chevrolet automobile. Positive test results for the presence of blood

were obtained on several items including the trunk carpeting, plastic molding on the interior of the trunk, a tarp and on the handle of an ax. The officers also noted that the rubber molding around the lid had torn away and a tar-like substance was there seen which was similar to the substance found on Rose Shiflet's foot and hand.

At 8:30 p.m. on October 3, 1980, search warrant No. 3219 was issued authorizing a second search of defendant's apartment. On examining the living room carpet the officers noted that a section of it was stiff and cut the carpeting out at that spot, finding blood stains on the padding and flooring below. In addition, the officers seized a hair dryer bearing a blood stain, a vacuum cleaner bag and its contents, nail clippers, a towel, and a hammer to which human hair similar to the victim's had adhered. The evidence seized in the search was submitted to the Du Page County crime laboratory, the director of which testified in trial to having performed tests which determined that one of the hairs on the hammer was human, the ends crushed and it compared with that of decedent, although he could not say conclusively that the hairs were identical. Tests conducted on the hammer disclosed positive results for blood, and he determined that type A human blood was present on Rose Shiflet's shirt, the samples taken from the trunk of her automobile, the blood-spotted leaf found next to the car, the wallboard taken from the closet of the lower, vacant apartment, the blue jeans found in the bedroom of defendant's apartment, and on the padding and flooring from that apartment. He was unable to type the blood found on the carpeting although he determined it was human. He further testified that the tar-like substance removed from the victim's hand and foot were essentially the same in chemical composition as the sample removed from the rear of her automobile. This witness further testified that he had received a blood sample taken from the victim and determined that it was type A. He also discovered a nail clipping caught in the fibers of the carpeting removed from defendant's apartment and further clippings in the vacuum cleaner bag.

I

### Search Warrant No. 3219

Defendant contends first that the evidence seized from his apartment pursuant to search warrant No. 3219 should have been suppressed pursuant to his motion, as the complaint and affidavit for search warrant were premised upon privileged information in violation of his attorney-client privilege.

At the hearing of the defendant's motion to suppress, evidence was presented that at 1 p.m. on October 1, 1980, defendant met with attorney Charles Kaeding, to whom he had been referred for possible representation on a murder charge, although none had yet been filed. They discussed the ongoing investigation into the death of Rose Shiflet, and attorney Kaeding agreed to defend in the event charges were placed against defendant. Attorney Kaeding then brought into his office an investigator, John Ylisela, and instructed defendant that Ylisela would discuss the matter with him in greater detail and he should answer his questions and cooperate with him. Defendant did so.

Paul Dugan, a deputy sheriff, testified at the hearing that John Ylisela called him at the sheriff's office on the evening of October 1 and, after inquiring whether Dugan was working on a murder investigation in which the victim's name was Rose, Ylisela asked to meet with him. Dugan had known Ylisela for several years and they had been fellow police officers; Dugan believed Ylisela was now working as an investigator for an insurance company. When they met a few minutes later at about 8 p.m. in a parking lot, Ylisela told Dugan that defendant had killed his wife and gave a detailed account of how he had done so and disposed of her body. Ylisela related that while watching a loud movie on television, defendant struck Rose on the head with a hammer with a new handle; she fell to the floor but was not dead so he choked her. She scratched him repeatedly on his arms and upper body. Defendant placed a plastic bag over her head and clipped her fingernails, then cleaned up the carpet with soap and water, drying it with a hair dryer. He placed the body in the trunk of her car, then called the police to advise his wife was missing. Thereafter, defendant drove into the country and dumped the body near the road. When defendant returned to the apartment, he called his wife's family and brought one of them to the apartment. While she was there he noticed blood on his pants and cleaned them in the sink. Dugan inquired as to the source of Ylisela's information and was told he did not want to know. Ylisela also said he would deny having met with Dugan or telling him anything.

Dugan returned to the police station and prepared a report containing the information received by Ylisela, noting the source as an unnamed informant. Dugan's superiors did not accept that, and he rewrote the report naming John Ylisela as the source, describing him as a citizen who was not a paid informant.

John Ylisela testified at the suppression hearing that he was a private investigator with an office in Wheaton which he rented from at-

torney Charles Kaeding. He interviewed defendant on October 1 at attorney Kaeding's direction and gave Kaeding a synopsis of the interview. He and Kaeding also discussed whether defendant's arrest was imminent and who Ylisela might question about the matter. Ylisela then called Officer Dugan and arranged to meet him; they had been acquainted since 1973 when both were police officers. Ylisela had seen Dugan twice in 1980 and had then advised him he was employed as a private investigator for Hargraves Secret Service. When Ylisela met with Dugan that night, they exchanged information about the case with Ylisela providing Dugan with details regarding the homicide in response to questions. Ylisela advised Dugan he would not reveal his source, and they agreed neither would discuss the fact of the meeting as it would put Ylisela's position in jeopardy. On the following day, Ylisela was called to the sheriff's office and Sergeant George Weihofen asked whether he had given any information to any member of the department; he denied that he had done so.

Sergeant Weihofen testified he headed the investigation of Rose Shiflet's death and had been advised by Officer Dugan that Charles Kaeding was defendant's attorney; he believed Dugan learned that on October 1 when Dugan saw Kaeding at defendant's apartment. Weihofen later learned Ylisela shared office space with Kaeding.

The defendant testified to the fact of his conversations with attorney Kaeding and John Ylisela on October 1 and stated he did not authorize Ylisela to talk to anyone other than defendant's attorney.

The record also discloses that on October 3, Officer Paul Dugan presented a complaint for search warrant, supported by his affidavit, to a judge who issued warrant No. 3219 authorizing the second search of defendant's apartment and the seizure of "blood stains, fingernail clippings, hammer with a new handle." The search warrant was executed that day and, as earlier noted, evidence of blood was seized together with fingernail clippings and a hammer with a new handle, all of which were introduced at defendant's trial.

The complaint and affidavit initially stated that Detective Dugan had been contacted by and met with John Ylisela on October 1, 1980. It then repeated the detailed information given to Dugan by Ylisela relating to the killing of defendant's wife as earlier noted, identifying Ylisela as an ordinary citizen who is not a paid police informant.

The next paragraphs of the complaint stated "that independently of this above-mentioned conversation with John Ylisela, your affiant, being assigned the investigation of this homicide is informed as follows." There followed a recitation of purported facts known to the affiant through his personal observation and the investigative efforts of

other officers, in which the affidavit stated, *inter alia*:

That decedent's body was discovered at 7:50 a.m. by a jogger and reported to the sheriff's office, that affiant went to the scene and viewed it; that John Shiflet identified the deceased as his wife; that on September 30, 1980, between 7 p.m. and 10 p.m., a television program dealing with the execution of Jews in Nazi Germany was aired, affiant gaining this information from WBBM TV, Channel 2 in Chicago; that decedent's head bore a wound consistent with being struck with a hammer, as observed by affiant and by discussion with the physician who performed the autopsy; that a hammer with a new handle was observed in the decedent's apartment by other officers who so advised affiant; that wounds on decedent's throat were consistent with strangulation; that Joan Alleva reported to officers that John Shiflet had scratches on his arms on the night of October 1, 1980; that no blood or wet spots were seen on the carpet by officers executing a search warrant on October 1, 1980; that decedent's fingernails were cut short and fingers cleaned, as observed by the autopsy physician, and decedent's mother noted the nails were extremely short and poorly clipped although they had been long and well groomed; that blood was observed by affiant on the staircase of decedent's apartment on October 1, and also on rocks near the building and decedent's car; that her car had blood in the trunk; that John Shiflet reported to the sheriff's office his wife had been missing since 8 p.m. on October 1; that decedent's purse was found by a truck driver, who reported it to affiant, and her shoe was found by the side of the road; that no plastic bag containing blood has been recovered; that on execution of a prior search warrant No. 3218 on October 1, damp blue jeans containing blood were located in John Shiflet's closet; that decedent's mother observed defendant's knuckles were cut and bruised on October 2.

The complaint and affidavit concluded by reciting that on the morning of October 3, 1980, affiant was told by Assistant State's Attorney Thomas Knight that he had just received a telephone call from attorney Al Botti, who told him no one should question John Ylisela about anything he may have learned from Botti's client, Shiflet, as it was protected by the attorney-client privilege because Ylisela was working for Shiflet's attorney.

In denying defendant's motion to suppress, the trial court found there had been no invasion of defendant's attorney-client privilege by the State as the information given to the police by the investigator for defendant's counsel had not been affirmatively sought out by the police. The trial court also found that there was a sufficient factual

basis to support issuance of search warrant No. 3219, but did not indicate whether that finding was dependent upon or apart from the information provided by Ylisela.

Defendant argues that the knowing use of the privileged information given to the police by Ylisela as a basis for issuance of the search warrant violates defendant's right under the sixth amendment to the effective assistance of counsel. He asserts that the evidence seized in that search of his apartment should be excluded in a new trial. The State contends that as the police did not acquire the information as a result of any affirmative conduct on their part to breach the attorney-client relationship, the lawfully received facts could properly be used in support of issuance of the search warrant. The State also argues that the complaint and affidavit were sufficient to establish probable cause based only upon the facts acquired by the investigative efforts of the police, disregarding the information imparted by Ylisela. The State further contends the communication by Ylisela was not protected by the attorney-client privilege, as it fell within the crime-fraud exception to it.

It is clear that the communications between defendant and his attorney or the attorney's investigator were privileged and thus immune from compelled disclosure unless waived. (*People v. Adam* (1972), 51 Ill. 2d 46, 48, 280 N.E.2d 205; *People v. Knippenberg* (1977), 66 Ill. 2d 276, 282-84, 362 N.E.2d 681.) It also seems apparent that if such privileged matters are procured by the State it may not use them as substantive evidence or for impeachment of defendant in trial. (66 Ill. 2d 276, 362 N.E.2d 681.) The State and defendant agree no Illinois case has addressed the issue as presented here and offer no factually similar cases from any other jurisdiction.

Defendant considers analogous *People v. Knippenberg* (1977), 66 Ill. 2d 276, 285, 362 N.E.2d 681, wherein the court found use of defendant's privileged communication to an investigator for his attorney for impeachment of defendant in trial violated his right to a fair trial and to the effective assistance of counsel. In that case, defendant's statements were secured by the State's Attorney by undisclosed means from the public defender's investigator and used in trial to impeach defendant without prior notice the State had acquired the privileged matters. In the present case, however, the State did not act to breach the attorney-client relationship as the privileged material was divulged by the attorney's investigator who was privy to it. Nor were the police aware, when they received the information, that its source was a privileged communication. Moreover, no use was made by the State in trial of defendant's communications to his attorney or the in-

vestigator. We consider *People v. Knippenberg* to be factually inapposite to the circumstances presented in this case.

Defendant also offers in support of his argument *State v. Sullivan* (1962), 60 Wash. 2d 214, 373 P.2d 474, *Muetze v. State* (1976), 73 Wis. 2d 117, 243 N.W.2d 393, and *Bishop v. Rose* (6th Cir. 1983), 701 F.2d 1150. In *State v. Sullivan* defendant's attorney was called as a witness for the State in her trial for murder and was required to testify to information he had received from his client. The reviewing court understandably reversed defendant's conviction because of the forced disclosure of the confidential communications between attorney and client.

In *Muetze v. State* (1976), 73 Wis. 2d 117, 243 N.W.2d 393, a search warrant was obtained based solely upon information disclosed to the police by defendant's wife in violation of the marital privilege provided under the Wisconsin statute. In holding that disclosures made in violation of that privilege may not be used to obtain a search warrant, the court applied that State's statutory rules of evidence which specifically extended that privilege to search warrants. The court noted, however, that "there appears to be no Fourth Amendment prohibition against using privileged communications as the basis for a finding of probable cause to search." 73 Wis. 2d 117, 126, 243 N.W.2d 393, 397.

In *Bishop v. Rose* (6th Cir. 1983), 701 F.2d 1150, defendant was in jail awaiting trial for murder. Following an attempted escape by his cellmates, the cell was searched and police seized a document prepared by defendant at the request of his attorney relating to the defense of his case. The police returned the document, but first made a copy which was used in trial to impeach defendant. The reviewing court concluded that delivery of the document to the prosecutor and its use in trial was an improper interference with the attorney-client relationship under the sixth amendment.

We do not consider these cases support extension of the exclusionary rule to the evidence seized in the search of defendant's apartment as the circumstances are not similar.

While it appears that defendant's privilege to consult freely with his attorney was violated without his consent by the investigator engaged by defendant's attorney, no conduct by the State was involved. The police responded to an offer of information regarding the murder investigation and were not then aware of Ylisela's connection with defendant. Most of the information given by him was already known to the police, with Ylisela supplying some details and the name of the defendant. That could not have been a surprising revelation to the po-

lice as they had already focused upon defendànt and had searched his apartment under an earlier warrant.

If, as urged by defendant, the facts improperly divulged to the police by Ylisela, and those same facts learned through the separate investigation by the officers, may not be used for search warrant or any other purpose, enlightened defendants may well seek to arrange a similar breach of the privilege to foreclose the production or use of evidence against them. We do not believe that the sixth amendment requires that conclusion.

It is clear that the complaint and affidavit for search warrant, absent the facts supplied by Ylisela, was sufficient to establish probable cause for the second search of defendant's apartment. While it is true this search focused upon the hammer with a new handle and blood stains on the carpet not earlier noticed, sufficient facts were known to the officers, without Ylisela's assistance, to induce them to return to the apartment seeking further evidence of the crime. As the untainted facts in the complaint and affidavit amply support issuance of the search warrant, we conclude the evidence seized was not subject to suppression on the grounds urged by defendant. Compare *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674.

The State has also argued that the crime-fraud exception to the attorney-client privilege applied to defendant's conversation with John Ylisela, asserting defendant sought legal assistance for illegal or fraudulent purposes. (See *People v. Wurbs* (1976), 38 Ill. App. 3d 360, 347 N.E.2d 879; *Lanum v. Patterson* (1909), 151 Ill. App. 36; *People v. Marcofsky* (1920), 219 Ill. App. 230; 8 Wigmore, Evidence sec. 2292 (McNaughton rev. 1961).) The State suggests defendant sought to cover up his commission of the homicide and prepare a fraudulent defense through the assistance of the investigator and attorney.

■ The trial court determined that the State had not made a sufficient showing that the crime-fraud exception applied to defendant's conversation with the investigator, and we conclude that finding was not against the manifest weight of the evidence. *People v. Conner* (1979), 78 Ill. 2d 525, 401 N.E.2d 513.

II

### SEARCH WARRANTS NOS. 3215 AND 3218

■ Defendant next contends the trial court erred in denying an evidentiary hearing of his allegation the sworn complaints upon which these search warrants were based contained false statements. He argues that the affiant falsely or recklessly stated therein that he had

observed in decedent's car a rope "soaked" with blood and an ax "covered" with blood; that the statements were untrue, and defendant was entitled to an evidentiary hearing to determine whether the search warrant should be declared void and the evidence seized suppressed.

In *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, the court established a limited right to an evidentiary hearing challenging the truthfulness of facts contained in an affidavit for a search warrant. Where a defendant makes a substantial preliminary showing that (1) a false statement, made knowingly or intentionally or with a reckless disregard for the truth was included by affiant in his affidavit; and (2) the alleged false statement was necessary to the finding of probable cause, the trial court must conduct an evidentiary hearing if requested by defendant. At such hearing, defendant has the burden of proving his charge of perjury or reckless disregard for the truth by a preponderance of the evidence. If the false statement is established and is disregarded, and if the affidavit is then insufficient to establish probable cause, the search warrant will be held void and the results of the search suppressed. (*Franks v. Delaware* (1978), 438 U.S. 154, 164-65, 57 L. Ed. 2d 667, 677-78, 98 S. Ct. 2674, 2681; *People v. Hothersall* (1981), 103 Ill. App. 3d 183, 430 N.E.2d 1142.) For an assertion of fact to be considered false, it must be such as will support a prosecution for perjury. *People v. Young* (1972), 4 Ill. App. 3d 602, 605, 279 N.E.2d 392; *People v. Moran* (1978), 58 Ill. App. 3d 258, 259, 373 N.E.2d 1380.

Defendant relies upon *People v. Garcia* (1982), 109 Ill. App. 3d 142, 440 N.E.2d 269, *cert. denied* (1983), 460 U.S. 1040, 75 L. Ed. 2d 792, 103 S. Ct. 1433, to support his argument that Illinois has gone beyond the two-prong test set forth in *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, and states that once defendant has made a preliminary showing a complaint for search warrant contains a deliberate misstatement of fact, he is entitled to an evidentiary hearing even though the remainder of the affidavit is sufficient alone to establish probable cause. See *People v. Farnsworth* (1981), 95 Ill. App. 3d 105, 107, 419 N.E.2d 693, 694; *People v. Reynolds* (1981), 96 Ill. App. 3d 79, 420 N.E.2d 1193.

At the hearing of defendant's motion to suppress, preliminary evidence was presented by him that the laboratory reports stated no visible reddish-brown stains were observed on the rope and a benzidine test was negative, demonstrating an absence of blood. As to the hatchet, the report stated the head tested negative for blood and a small reddish-brown discoloration on the label yielded positive benzi-

dine tests, as did also the handle and cover. Defendant argues that affiant's statements the exhibits were "soaked" or "covered" with blood were clearly false, thus entitling him to an evidentiary hearing regardless of whether the remaining allegations were sufficient to support the finding of probable cause.

The trial court found that defendant had made specific allegations of falsehood or reckless regard for the truth as to a portion of the affidavit; however, it reserved ruling on the question whether defendant's supporting reasons for the allegations were sufficient to make the "substantial preliminary showing" required by *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, and considered first whether the affidavit would be sufficient absent the challenged matters. The court concluded the remaining facts were sufficient to establish probable cause and denied defendant's motion.

Defendant does not here challenge the ultimate ruling of the trial court, and argues only that on the strength of *People v. Garcia* (1982), 109 Ill. App. 3d 142, he is entitled to a full evidentiary hearing of the alleged false statements in the affidavit and suppression of the evidence if that determination is made without consideration of the sufficiency of the balance of the affidavit.

Initially, we agree with the trial court that the affidavits were sufficient to establish probable cause for the search of defendant's apartment and the car without the challenged words. As to those words, we conclude defendant failed to make a substantial preliminary showing they were false or made with a reckless disregard for the truth.

As relevant, the detailed affidavits by Sergeant George Weihofen stated:

> "While examining the outside of that vehicle [decedent's car] your affiant observed what appeared to be a spot of human blood on the rear hatch of the vehicle and also what appears to be a hand print in blood at the lower edge of the rear hatch of the vehicle. From outside the car your affiant observed within the vehicle what appears to be a rope soaked with blood and a small ax, the handle of which appears to be covered with blood. Immediately adjacent to the car was a leaf bearing what appeared to be a spot of blood."

Other statements in the affidavits recited further facts known to the officer relating to the death of Rose Shiflet.

While it is apparent the exhibits were not soaked or covered with blood when the officer viewed them, affiant's statements reflect his belief as to their appearance through the car window. The laboratory report noted positive tests for blood on the ax and that the dis-

coloration on the label appeared to have been washed. The rope is shown in photographs contained in the record as it was located in the car and it has, in part, an observable reddish cast which could be mistaken for blood as viewed by the affiant. While the terms used by affiant were exaggerated, they cannot be said to be knowingly or recklessly false.

As we conclude defendant did not make a substantial preliminary showing of falsity, we need not determine whether *People v. Garcia* (1982), 109 Ill. App. 3d 142, was correctly decided. It is noteworthy, however, in that case the court also stated, "This, of course, does not mean that any negligent or honest misstatements would prove fatal or that every fact stated in the affidavit must be factually true. However, it certainly must mean that every fact stated in the affidavit is included in good faith and is believed to be true by the police officer." 109 Ill. App. 3d 142, 148, 440 N.E.2d 269, 274.

## III

■ Defendant next contends that use in trial of an oral statement made by him which was not disclosed to the defense should be excluded as a sanction for the discovery violation and, also, that its prejudicial effect denied him a fair trial.

At trial the following colloquy took place during the examination by the State of Officer Litzo:

"MR. KNIGHT: During the time that you were in the vicinity of the Chevy Citation at 1601 Maple Terrace in that parking lot area, do you recall having any conversation with anyone concerning the cleaning of the automobile?

A. Yes. I was approached by a gentleman who identified himself as Mr. Shiflet, and he said he wanted to take the Citation.

\* \* \*

MR. KNIGHT: Can you tell us, to the best of your recollection, what was said and by whom in that conversation?

A. Mr. Shiflet stated that he was going to take the automobile, and we said that—or, I told him that he couldn't take the automobile.

And he said, 'Well, he was doing it under his attorney's advice.'

I told him that if he insisted on taking the automobile I would place him under arrest.

At that point he left."

Defendant's motion for a mistrial was denied.

Defendant's initial argument that this testimony should be excluded as a sanction for the State's failure to comply with discovery orders was not preserved for review by inclusion in his post-trial motion and is waived. *People v. Lucas* (1981), 88 Ill. 2d 245, 250, 430 N.E.2d 1091; *People v. Jackson* (1981), 84 Ill. 2d 350, 358-59, 418 N.E.2d 739.

Defendant also argues the testimony had the effect of discrediting the defense in the eyes of the jury by implying his counsel had advised defendant to conceal evidence, thus allowing the jury to infer defendant's guilt from his exercise of the right to counsel. See, *e.g.*, *People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924; *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306; *People v. Jackson* (1974), 24 Ill. App. 3d 700, 321 N.E.2d 420.

We consider defendant's argument that he or his counsel was somehow discredited by this testimony to be speculative and without merit. Essentially, all that it disclosed was that defendant sought to take the car and had been advised in that regard by his counsel. This was an uncontested fact relating to defendant's activities on that day, and the State did not refer to it in its arguments to the jury.

■ In the cases relied upon by defendant, the prosecutors did in argument make improper comment relating to defendant's right to consult with counsel suggesting improper conduct on the part of defendants or counsel. In the present case, the State did not attempt in argument to link defendant's statement either to his guilt, use of counsel or suggest defendant's wish to take the car was to conceal evidence. We conclude the trial court did not abuse its discretion in the admission of that testimony and defendant is not entitled to a new trial on this grounds.

## IV

■ Defendant next contends that the expert witness' testimony as to the victim's blood type should have been excluded as the chain of custody of the blood sample was not established.

The autopsy physician testified he withdrew blood samples from Rose Shiflet's body which he placed in two vials. One was given to the toxicology laboratory of the coroner's office and the other vial to Deputy Sheriff Thomas Duhig, who was present when the blood was withdrawn. Officer Duhig testified he sealed the vial and kept it in his possession until placing it in the evidence locker of the sheriff's office crime laboratory. Phillip Gilman, director of the crime laboratory, testified he received a sealed vial of blood from the sheriff's evidence technician which was marked with the name "Shiflet," bore a sher-

iff's office complaint number and was sealed with tape marked "Coroner's Office." Gilman unsealed the vial and, after conducting tests, determined the blood was type A.

Defendant argues that as Gilman did not identify the evidence technicians who gave him the vial in the laboratory and Duhig did not testify, the vial he received from the autopsy physician was the same one tested by Gilman, the chain of custody was broken and a doubt is raised as to the identity and unchanged conditions of the blood sample Gilman tested. Defendant concludes he is entitled to a new trial at which the test results are excluded.

■ The trial court has broad discretion in determining the admissibility of evidence and expert testimony, and its determination will be reversed only for an abuse of that discretion which prejudiced defendant. (*People v. Reyes* (1981), 102 Ill. App. 3d 820, 832, 429 N.E.2d 1277; *People v. Franklin* (1981), 93 Ill. App. 3d 986, 993, 418 N.E.2d 155, *appeal denied* (1981), 85 Ill. 2d 569.) A chain of custody foundation is required when the offered evidence is not readily identifiable or is susceptible to alteration by tampering or contamination; the chain of custody must be of sufficient completeness to render it improbable that the item has been tampered with, exchanged or contaminated. (*People v. Winters* (1981), 97 Ill. App. 3d 288, 289-90, 422 N.E.2d 972, *cert. denied* (1982), 455 U.S. 923, 71 L. Ed. 2d 464, 102 S. Ct. 1282; see *People v. Cole* (1975), 29 Ill. App. 3d 369, 329 N.E.2d 880, *appeal denied* (1975), 60 Ill. 2d 598.) To establish a sufficient chain of custody, the State need not exclude every possibility that the evidence was tampered with, but only that it was reasonably probable the evidence was unchanged in any important respect, or substituted. (*People v. Witanowski* (1982), 104 Ill. App. 3d 918, 925, 433 N.E.2d 334; *People v. Gustowski* (1981), 102 Ill. App. 3d 750, 753, 430 N.E.2d 317; *People v. Tribett* (1981), 98 Ill. App. 3d 663, 673-74, 424 N.E.2d 688.) Unless defendant provides actual evidence of tampering or substitution, the State need only establish the stated probability and any deficiencies go to weight and not admissibility of the evidence. See *United States v. Lampson* (7th Cir. 1980), 627 F.2d 62; *People v. Witanowski* (1982), 104 Ill. App. 3d 918, 433 N.E.2d 334; *People v. Winters* (1981), 97 Ill. App. 3d 288, 422 N.E.2d 972, *cert. denied* (1982), 455 U.S. 923, 71 L. Ed. 2d 464, 102 S. Ct. 1282; *People v. Coleman* (1980), 91 Ill. App. 3d 646, 415 N.E.2d 553.

■ In the case at bar, it was established a blood sample taken from decedent's body by the physician was given Deputy Duhig, who sealed the vial and placed it in an evidence locker. Evidence technicians then gave a sealed vial of blood marked "Shiflet" to Gilman for

testing. While it is unclear whether the second vial of blood drawn by the physician was sealed, the vial tested by Gilman was sealed when he received it. Defendant's assertion that the vial tested may not have been the vial delivered to Duhig is mere speculation. The chain of custody was sufficiently complete to allow admission of the evidence, absent any affirmative showing of tampering or substitution. Further, even were the chain of custody considered insufficiently established, the evidence thereby derived was cumulative as type A human blood was found on the victim's clothing, car, carpet padding and flooring as well as on other items. Defendant's blood was tested independently revealing his blood type as O. Due to the nature of decedent's wound and the body's lack of blood volume, as well as the numerous blood-stained items, it would be an obvious inference that the victim's blood type was A without reference to the test to which defendant objects. Admission of evidence is not error where it is otherwise established properly. *People v. West* (1981), 102 Ill. App. 3d 50, 54-55, 429 N.E.2d 599; *People v. Duckworth* (1981), 98 Ill. App. 3d 1034, 1037-40, 424 N.E.2d 1337.

## V

■ Defendant next contends the trial court erred in allowing testimony of a witness whose name was not disclosed on the State's list of witnesses and who was also not qualified to testify to the contents of the business records of the apartment complex.

During cross-examination of the crime laboratory director, Phillip Gilman, defendant elicited from him the fact Gilman had not determined the age of blood stains found on the carpet of defendant's apartment. The State's Attorney then called Robert McSweeney, the building maintenance supervisor for the Four Lakes Village apartment complex, who testified, over defendant's objection, that by reference to the building records and his own recollection defendant's apartment had new carpeting installed two or three months before the offense. Business records of the complex pertaining to that apartment were also admitted in support of McSweeney's testimony.

Supreme Court Rule 412(a) (87 Ill. 2d R. 412(a)) requires the State to disclose to defendant the names and addresses of persons whom it intends to call as witnesses. The State's intent to call the witness is the critical element (*People v. Hanna* (1983), 120 Ill. App. 3d 602, 606, 457 N.E.2d 1352), and until the State forms that intent, there need be no disclosure (*People v. Hine* (1980), 89 Ill. App. 3d 266, 267, 411 N.E.2d 930). The trial court may in its discretion, as an appropriate sanction, exclude evidence for noncompliance with discovery pro-

visions; however, that is a harsh sanction of last resort. *People v. Brown* (1982), 106 Ill. App. 3d 1087, 1093, 436 N.E.2d 696, *appeal denied* (1982), 91 Ill. 2d 573; *People v. Galindo* (1981), 95 Ill. App. 3d 927, 933, 420 N.E.2d 773, *appeal denied* (1981), 85 Ill. 2d 569.

Until defendant partially impeached Gilman's testing procedure by demonstrating his failure to determine the age of the blood stains on the carpet, there was no need for McSweeney to testify. Any prejudice or surprise to defendant was also blunted by his interview of the witness prior to his testimony and defendant's opportunity to cross-examine. It is also apparent that defendant was aware the carpet in his apartment was new. The State need not inform defendant of a witness' name until it forms the intent to call him, even if during trial. (*People v. Manley* (1974), 19 Ill. App. 3d 365, 371, 311 N.E.2d 593.) The trial court's discretion to allow an undisclosed witness to testify has been abused only if defendant is surprised or prejudiced, even where the State has not fully complied with discovery. *People v. Morales* (1982), 109 Ill. App. 3d 183, 189, 440 N.E.2d 302; *People v. Rice* (1982), 108 Ill. App. 3d 344, 351, 438 N.E.2d 1333.

■■■ Cases cited by defendant, *People v. Bailey* (1982), 103 Ill. App. 3d 503, 431 N.E.2d 723, *People v. Millan* (1977), 47 Ill. App. 3d 296, 361 N.E.2d 823, and *People v. Mourning* (1975), 27 Ill. App. 3d 414, 327 N.E.2d 279, are distinguishable as there the State's failure to disclose was by design, in bad faith and far more egregious than the State's failure here. The State's Attorney asserted he only became aware of the potential issue of the age of the carpet during trial and would have had no reason to call McSweeney but for defendant bringing out the failure to determine the age of the blood stains. In the circumstances presented, the trial court's decision to allow this witness to testify was not an abuse of discretion and imposition of the discovery sanction would not have been appropriate.

■■■ Defendant also contends that neither McSweeney's testimony nor the apartment records were admissible under the business records exception to the hearsay rule as he was not competent to lay a proper foundation for the exception. He argues McSweeney did not make the records himself and there was insufficient evidence he was familiar with the record keeping practices of the complex as he only used and had access to them.

Section 115—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 115—5(a)) provides as follows:

"Sec. 115—5. Business Records as Evidence.

(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any

act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

The term 'business,' as used in this Section, includes business, profession, occupation, and calling of every kind."

In *People v. Lewis* (1977), 52 Ill. App. 3d 477, 367 N.E.2d 710, *appeal denied* (1977), 67 Ill. 2d 594, a motel ledger was considered to have been properly admitted into evidence although the foundation witness did not keep the ledger. As the witness testified the record was made in the ordinary course of business and testified to procedures used in compiling it as well as to its accuracy, it came within the hearsay exception.

In the case at bar, McSweeney testified that a separate maintenance file was kept on each apartment unit in the ordinary course of business; that he was familiar with and routinely used the records and that transactions noted therein were recorded as they occurred. He further testified that if a buyer or renter ordered carpeting or a change in an apartment, an order sheet was filled out for anything that was ordered. A property inspection form and check list was given to each occupant to fill out and return to the maintenance department, and such records were kept in the file for defendant's apartment.

We conclude the foundation provided was sufficient to clothe this evidence with sufficient *indicia* of reliability and trustworthiness as to support its admission within the exception. See *People v. Clark* (1982), 108 Ill. App. 3d 1071, 440 N.E.2d 387; *People v. Lewis* (1977), 52 Ill. App. 3d 477, 367 N.E.2d 710, *appeal denied* (1977), 67 Ill. 2d 594.

## VI

Defendant's final contention is that the imposition of a sentence of natural life imprisonment violated his right to due process and the equal protection of the laws. This argument has been waived as it was not raised in defendant's post-trial motion or at the sentencing hearing. *People v. Lucas* (1981), 88 Ill. 2d 245, 250, 430 N.E.2d

182

1091; *People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227; *People v. Perez* (1983), 113 Ill. App. 3d 143, 151, 446 N.E.2d 1229, *appeal denied* (1983), 94 Ill. 2d 556.

In any event, it has been determined that the statute under which defendant was sentenced met due process and equal protection constitutional standards after consideration of arguments which are essentially the same as presented here. See *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344; *People v. Perez* (1983), 113 Ill. App. 3d 143, 151, 446 N.E.2d 388, *appeal denied* (1983), 94 Ill. 2d 556; *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 591-92, 444 N.E.2d 662, *appeal denied* (1982), 93 Ill. 2d 544.

Accordingly, the judgment of the circuit court will be affirmed.

Affirmed.

SEIDENFELD, P.J., and UNVERZAGT, J., concur.