THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WALTER JONES, Defendant-Appellant.

First District (3rd Division)   No. 83—2630

Opinion filed September 17, 1986.—Rehearing denied November 13, 1986.

Steven Clark and Julie B. Aimen, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, James E. Fitzgerald, and Nancy L. Grauer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Defendant, Walter Jones, was convicted, following trial by jury, of the offenses of rape and indecent liberties with a child. He was sentenced to six years' imprisonment at the Department of Corrections. Defendant now appeals his conviction and raises five issues. First, defendant argues that the jury should have been permitted to hear impeachment testimony regarding prior inconsistent statements of

one of the defense witnesses. Second, defendant claims that the chain of custody of vaginal specimens admitted into evidence is incomplete. Third, defendant claims that the prosecutors made improper and prejudicial remarks in closing argument. Fourth, defendant argues that he was prejudiced by the omission of certain instructions to the jury. Fifth, defendant claims that he was denied effective assistance of counsel.

The prosecutrix testified that on June 25, 1982, defendant Walter Jones helped her family move to a new apartment on Aberdeen Street. She testified that defendant asked her mother, Willie Mae, if defendant could take her, then age 11, and her younger sister, then age 8, along to return the U-Haul trailer. The mother agreed. After returning the trailer, defendant drove the two girls to the apartment building owned by his aunt, Ella Sears, and led them to a room in the basement. Defendant asked the girls if they wanted anything from the store, and sent the younger sister out for some potato chips.

The prosecutrix testified that the basement room in which she and defendant remained had a bar with stools and two built-in, upholstered benches with a bed between them. Defendant asked her if she wanted him to "do it" to her. She said she did not. He ordered her to remove her pants, and when she protested, warned her that she knew what would happen to her if she refused. Defendant had intercourse with her. After 10 minutes, the doorbell began to ring. After several rings, defendant told her to dress and warned her not to say anything. Defendant opened the door and the younger sister, who had returned from the store, asked her what was wrong. The prosecutrix told her sister that nothing was wrong, and testified that she did so because she was afraid that defendant might hurt them.

The prosecutrix testified that defendant took the girls up to his aunt's apartment where they sat in the living room while defendant tried to repair some broken locks. Defendant then took the girls to the home of George and Elizabeth Jones, the girls' cousins. The prosecutrix told them nothing about what had happened. Leaving the Jones' home, defendant drove the girls back to the new apartment and told the mother that his aunt wanted the girls to spend the night at her home. The mother consented. The prosecutrix said nothing about the earlier events to her mother.

The prosecutrix testified that defendant took the girls back to his aunt's building and led them into the basement. He pushed the bed against one of the upholstered benches, and, after the girls changed their clothes in the bedroom, he told them to lie down in the bed and go to sleep. Defendant lay down on the bench to the right of the bed

on which the prosecutrix was lying. She was awakened by defendant, who asked her if she was ready for him "to do it again." When she said, "no," he told her that if she refused, she knew what was going to happen to her. He had intercourse with her, then went to a bench across the room and fell asleep. The next morning, defendant bought breakfast for the girls and again warned the prosecutrix not to say anything. He then drove the girls to their new home.

The prosecutrix' sister testified that when Walter Jones answered the door upon her return from the grocery store, his pants zipper was undone, and the prosecutrix appeared to the sister to have been crying. The prosecutrix told her that nothing was wrong. The sister told her mother about this when the girls returned to their new apartment. The mother called the police.

At trial, Walter Jones admitted that he was present at all times in question, but he denied ever having sexual intercourse with the prosecutrix. He testified that the children requested permission to spend the night at his aunt's home, and, on the evening of June 25, 1982, he put them to sleep on a cot in the basement room of the aunt's building. Walter testified that after the children went to bed, he sat at the bar for 15 minutes and then he went to the corner tavern for a quart of beer. He brought back the beer and sat in the basement and drank it. He fell asleep with his head on the bar and later moved to the rug on the floor where he slept until the following morning. Upon awakening, he awakened the girls, told them to get dressed, and took them to the store where they bought cold cuts. Walter testified that after going to the store, he was tired and took the children home. The arresting officer testified that defendant had been sleeping at about 7:45 p.m. on Saturday, June 26, 1982, when he was arrested in the bedroom of his home. The officer read defendant his rights and, in the presence of defendant's wife, asked defendant if he knew the prosecutrix, her mother and her sister. Defendant said he did not, but later admitted that he did, apparently by their nicknames. Defendant was eventually taken to the Area One police station where he was interviewed by a detective and an assistant State's Attorney. These men testified that defendant admitted to them that he had sex with the child, but that she had approached him, asked him to go to bed with her, and fondled him until he finally agreed.

At trial, defendant denied making any such admissions. Walter Jones testified that the police told him he could not make bond until he made a statement. He testified that he was tired, exhausted and upset and, as the police continued to question him, he eventually told them to write down whatever they wanted to. He testified that his re-

quest to see what the assistant State's Attorney had written was refused.

During the trial, the defense called as a witness, Willie Mae Stephenson, the mother's landlady, who lived on the first floor of the family's building. Mrs. Stephenson testified that she was not at home on the day the girls told their mother what had happened, and that she did not hear any argument or shouting coming from their basement apartment on that day. Mrs. Stephenson further testified that the prosecutrix told her that she had been raped by defendant. This testimony was contrary to that which the defense had expected Mrs. Stephenson to give, and the court allowed the defense to question her as an adverse witness. Mrs. Stephenson denied that she had ever had a telephone conversation in which she told defense attorney Cohan that she saw the mother repeatedly hit the prosecutrix, who was telling her mother, "He didn't do nothing," until the prosecutrix finally said, "He did it." The trial judge refused to permit the jury to hear testimony from Mr. Cohan or two other witnesses who claim to have heard Mrs. Stephenson say that the prosecutrix was beaten until she implicated defendant.

Mary Kay Boyd, an emergency-room nurse at Mercy Hospital, testified that she prepared prosecutrix' Vitullo Kit. This kit contained the vaginal-smear specimens that were to be analyzed for sperm content by the crime lab.

William Ogletree, an evidence technician for the crime lab, testified he picked up the Vitullo Kit from the security police department of Mercy Hospital and transported the kit to the microanalysis department of the police crime lab.

Crime lab microanalyst Karen Smith testified that on September 28, 1983, she received the Vitullo Kit from the crime lab file. She further testified that she observed spermatozoa on the slides it contained and that the report from the physician who examined the prosecutrix at Mercy Hospital indicated that he had found no sperm. Over defense counsel's objection, the Vitullo Kit was entered into evidence.

The jury found defendant guilty of rape and indecent liberties with a child. The court entered judgment on the verdicts and sentenced Walter Jones to six years' imprisonment. Walter Jones now appeals.

I

■ Defendant first argues that the trial court erred by refusing to allow defendant to call attorney Cohan, George Jones and Ethel Wardlow to testify that Mrs. Stephenson had stated that she had seen

the mother beat the prosecutrix until the prosecutrix said that defendant had raped her. Defendant claimed, in an offer of proof, that on September 28, 1982, he telephoned attorney Richard Cohan and said that he was then in the apartment of Mrs. Stephenson along with her husband and daughter, and George Jones, who is no relation to defendant. Mr. Cohan, in the offer of proof, said he spoke by telephone with a woman who identified herself as Mrs. Stephenson. She told Mr. Cohan that on the Saturday evening in question, she went downstairs when she heard yelling and saw the mother whipping the prosecutrix. The child kept saying, "No, he didn't do anything." Eventually the girl said, "He did do it," and the mother stopped beating her. Mr. Cohan submitted notes of this conversation to the trial judge in support of the offer of proof.

Defendant also claims that Mrs. Stephenson related this scenario to Ethel Wardlow, aunt of the prosecutrix and the former girlfriend of defendant. On the witness stand, however, Mrs. Stephenson denied that she had ever made either out of court statement. She asserted that the only conversations she had had with regard to the rape of the prosecutrix were with the child and her mother. She testified that she questioned the prosecutrix extensively as to whether defendant had actually raped her, and that the child answered, "Yes."

Defendant claimed surprise by this testimony and was permitted by the court to treat Mrs. Stephenson as an adverse witness. Defendant sought in addition to call attorney Cohan, George Jones and Ethel Wardlow as witnesses to testify that Mrs. Stephenson had previously stated that she had seen the mother beat the prosecutrix until the girl implicated defendant. The court refused the request. Defendant now claims that this refusal was error.

In Illinois, however, the law is well settled:

"[W]hen a witness unexpectedly gives testimony against the party calling him, such party has the right to examine him and by such examination to show that the witness is giving unexpected testimony, and to specifically call the attention of the witness to former statements made by him for the purpose of refreshing his memory or awakening his conscience, and to cause him to relent and speak the truth if he was lying. This, however, is as far as the party may go, and under no circumstances may he show, either by the written statement of the witness or by other witnesses, that the witness did, in fact, make those statements." (*Schoolfield v. Witowski* (1964), 54 Ill. App. 2d 111, 121-22, 203 N.E.2d 460.)

"If the witness admitted making the previous statement, it

would prove nothing except that he, an admittedly unreliable witness, had said so. If the witness denied making the statement the matter would necessarily end there, because to pursue it further would be trying a collateral issue rather than a fact material under the indictment." (*People v. Grigsby* (1934), 357 Ill. 141, 149, 191 N.E. 264.)

See also *People v. Chitwood* (1976), 36 Ill. App. 3d 1017, 1025, 344 N.E.2d 611.

We acknowledge that the law of this State recently was changed to permit either party to challenge the credibility of his own witness:

"(a) The credibility of a witness may be attacked by any party, including the party calling him.

(b) If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination." (87 Ill. 2d R. 238.)

Although this supreme court rule permits any party to impeach his own witness, it does not grant permission to try collateral issues in order to prove the unreliability or untruthfulness of the witness. Here, the trial court was asked to try the collateral issue of whether Mrs. Stephenson had made the statements. We find no error in the trial court's refusal to allow Mr. Cohan, Mr. Jones and Ms. Wardlow to testify on that issue.

II

■ Defendant next claims that the trial court erred in denying his motion to exclude testimony regarding the presence of sperm. He contends the chain of custody of the prosecutrix' Vitullo Kit, containing two vaginal-smear specimens and two vaginal-swab specimens taken June 26, 1982, was incomplete. A sufficient chain of custody does not require every person involved in the chain to testify. (*People v. Irpino* (1984), 122 Ill. App. 3d 767, 775, 461 N.E.2d 999.) "To establish a sufficient chain of custody, the State need not exclude every possibility that the evidence was tampered with, but only that it was reasonably probable the evidence was unchanged in any important respect, or substituted." (*People v. Shiflet* (1984), 125 Ill. App. 3d 161, 178, 465 N.E.2d 942.) "Unless defendant provides actual evidence of tampering or substitution, the State need only establish the stated probability and any deficiencies go to the weight and not admissibility of the evidence." 125 Ill. App. 3d 161, 178, 465 N.E.2d 942.

■ Through the testimony of its witnesses, the State established the reasonable probability that the evidence was unchanged. Mary Kay Boyd, the nurse who assisted the emergency-room doctor in preparing the Vitullo Kit, testified that at 8:30 p.m. on June 26, 1982,

she put everything inside, taped it securely, and handed it to the Mercy Hospital security officer. In court, she recognized her own signature and that of the security officer on the kit. William Ogletree, an evidence technician with the Chicago police department, testified that at 1:30 a.m. on June 27, 1982, he obtained the sealed kit from Officer John Turner of the Mercy Hospital security police department, signed and initialed it, and turned it over to the crime laboratory. Karen Smith, a microanalyst in the crime laboratory of the Chicago police department, testified that on September 28, 1983, she examined the slides of the prosecutrix' vaginal specimens, which had been stored in the laboratory files for more than one year, and that she resealed the kit. Mercy Hospital security officer John Turner did not testify at trial, nor did anyone from the crime lab where the evidence was stored. However, it is not required that every person who is a link in the chain of evidence testify at trial. (*People v. Irpino* (1984), 122 Ill. App. 3d 767, 775, 461 N.E.2d 999.) By presenting the witnesses that it did, the State established that it was reasonably probable that the evidence remained unchanged. Defendant has not provided evidence that the kit has been changed or tampered with. Therefore, any deficiencies in the chain of custody go to the weight and not the admissibility of the evidence. *People v. Shiflet* (1984), 125 Ill. App. 3d 161, 178, 465 N.E.2d 942.

Defendant also claims that "Smith testified that the kit was opened by the microanalysis section where the contents were removed and recorded on the kit itself and where slides are prepared. Therefore, the kit was opened prior to Smith receiving it." Ms. Smith's actual testimony was that she did not prepare the slides and the slides did not bear the date they were prepared. She further testified that she knew when the slides were prepared because information to this effect was on record in the microanalysis section. There is no evidence to support defendant's assertion that the kit was opened and the contents removed prior to the examination by the microanalyst.

Defendant also points to Karen Smith's testimony that the report she received indicated that the doctor who took the swab samples, and apparently prepared the slides, did not find any sperm on the slides he examined. Defendant did not introduce this report into evidence and did not call the doctor as a witness. This court is not willing to overrule the decision of the lower court on the basis of this hearsay testimony.

Defendant also proposes that the trial judge was under the impression that Karen Smith examined the slides soon after they were made, and not one year and three months later. Regardless of the

lower court's impression, the State presented evidence that established a sufficient chain of custody. This evidence was not rebutted by an offer from defendant of any evidence of tampering.

## III

■ Defendant next contends that he was denied a fair trial when the prosecutors made objectionable remarks on several occasions during closing arguments. However, defendant waived the issue of improper closing remarks by failing to raise the issue in his motion for new trial. "[A] party who files a motion for new trial in writing is limited on review to the grounds or reasons set forth therein and is deemed to have waived all other grounds or reasons for a new trial not there included." *Zukosky v. Grounds* (1980), 85 Ill. App. 3d 355, 365, 406 N.E.2d 848.

Defendant urges that this court review these closing remarks under the plain-error doctrine. He contends that the cumulative impact of the remarks was to deny him a fair and impartial trial. We see no need to discuss the propriety or impropriety of each remark. "[E]ven improper remarks generally do not constitute reversible error unless they result in substantial prejudice [citation]; that is, if they were a material factor in defendant's conviction [citation], such that the verdict would have been different had the comments not been made." (*People v. Smith* (1982), 111 Ill. App. 3d 895, 906, 444 N.E.2d 801.) Even if we were to find that each of the remarks was improper, we believe that the verdict would not have been different had the comments not been made. Therefore, we conclude that Walter Jones was not denied a fair trial by the closing remarks of the State.

## IV

Defendant next argues that the trial court erred by failing to give two necessary jury instructions. First, the defendant argues that, at trial, he denied stating to a policeman and an assistant State's Attorney that the prosecutrix had seduced him. Therefore, he proposes that pattern jury instruction No. 3.07 (Illinois Pattern Jury Instruction, Criminal, No. 3.07 (2d ed. 1981)) given to the jury with regard to his statement should have included the optional, bracketed phrase. Accordingly, defendant contends that the entire instruction should have read:

> "You have before you evidence that the defendant made statements relating to the offenses charged in the information. It is for you to determine [whether the defendant made the statement, and, if so,] what weight should be given to the

statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

To support his position, defendant cites *People v. Cook* (1965), 33 Ill. 2d 363, 211 N.E.2d 374. In that case, prejudicial error was found when the lower court failed to give an entire instruction—not simply the bracketed material. Because of that failure, the jury was never instructed to consider the circumstances surrounding the taking of defendant's statement.

■ We believe that *People v. White* (1984), 129 Ill. App. 3d 308, 472 N.E.2d 553, is more directly on point, involving the inclusion of the same optional, bracketed phrase in the jury instruction that defendant now brings to our attention. We find, as the court did in *White*, that the error, if any, was waived when the defendant failed to object to, or point out, the insufficiency of the instruction. He neither tendered the better instruction, nor mentioned the deficiency in his post-trial motion; nevertheless he now claims that the plain-error exception to the waiver rule requires reversal. However, plain-error exceptions are limited to the correction of grave errors, or where the case is so close factually that fundamental fairness requires that the jury be properly instructed. *People v. Huckstead* (1982), 91 Ill. 2d 536, 544, 440 N.E.2d 1248.

Here, the jury heard the testimony of an assistant State's Attorney and a police officer that defendant stated to them that the prosecutrix fondled his genitals and asked him to have sex with her. The jury was given the opportunity to judge the credibility of this testimony against defendant's claim that he was tired when questioned by these men, and told them to write down anything they wanted. The facts of this case are not so ambiguous that the outcome of the case would have been different if the optional phrase had been included. We do not find that fundamental fairness requires us to reverse Walter Jones' conviction because of the failure to include the bracketed words in the jury instruction.

■ Defendant also argues that the jury should have been instructed that closing arguments are not evidence. Again, defendant waived this issue by his failure to either object to or point out the omission, to tender the proper instruction, or to mention the error in his post-trial motion. We believe that the omission does not warrant reversal. The jury was told by the trial judge, in open court before opening arguments, that opening arguments were not evidence. This was repeated by prosecuting counsel at the beginning of closing argument, and the jury was warned by the trial judge during the State's

closing argument that closing arguments are not evidence. In light of the foregoing, we conclude that defendant was not so prejudiced by the omission as to require reversal.

## V

■ Finally, defendant argues that his trial counsel's failure to object to improper comments by the prosecutors in closing argument and his failure to tender proper jury instructions resulted in ineffective assistance of counsel. The effectiveness of counsel is to be measured by "whether the attorney is actually incompetent as reflected in the performance of his duties as a trial attorney, and whether that incompetence produced substantial prejudice to the defendant such that the outcome of the trial was probably changed." (*People v. Martin* (1983), 112 Ill. App. 3d 486, 493-94, 445 N.E.2d 795.) A defendant is not entitled to perfect representation or a successful defense. He is entitled to competent representation, as determined by the totality of counsel's conduct at trial. (112 Ill. App. 3d 486, 494, 445 N.E.2d 795.) Proof of prejudice cannot be based on speculation as to the outcome of the case had the representation been of higher quality. Nor is the test what appellate counsel would have done at trial. (112 Ill. App. 3d 486, 494, 445 N.E.2d 795.) When we consider the entire record of defendant's trial, we cannot say that defense counsel's failure to object to prosecutorial remarks or to tender preferred jury instructions so prejudiced defendant that the outcome of the case would have been different had trial counsel been more thorough in these instances. We therefore conclude that no reversal of the judgment below is required.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

RIZZI, P.J., and McNAMARA, J., concur.