(No. 67692.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DERRICK MORGAN, Appellant.

*Opinion filed February 22, 1991.—Rehearing denied*
*April 1, 1991.*

412

414

420

422

424

426

428

BILANDIC, J., took no part.

CLARK, J., joined by FREEMAN, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

The defendant, Derrick Morgan, was indicted along with Milbon Lockridge (a.k.a. Poncho) and Sam Green (a.k.a. B-Bop) by a Cook County grand jury on two counts of murder and one count of armed violence for the shooting death of David "Swift" Smith (Smith). The armed violence charge against the defendant was later dismissed. After a jury trial, defendant was found guilty of murder. The jury subsequently found him eligible for the death penalty and sentenced him to death. Defendant appeals directly to this court (107 Ill. 2d R. 603).

Concerning pretrial proceedings, the defendant raises as issues whether: (1) a *Batson* violation occurred; and (2) the trial court erred by excusing potential jurors who expressed reservations about the death penalty and by refusing defendant's request to further question a juror

about whether his attackers in a beating had been African-American.

Pertaining to the guilt phase of his trial, the defendant raises as issues whether: (1) he was proven guilty beyond a reasonable doubt; (2) the trial court erred by granting the State's motion *in limine* so that he could not present evidence that another person had committed the crime; (3) the trial court erred by allowing two defense witnesses to refuse to testify on the grounds of the fifth amendment; (4) the trial court properly informed two defense witnesses of the consequences of testifying on his behalf; (5) the trial court erred in advising some witnesses of the consequences of perjury, and in not advising others; (6) actions and comments by the trial judge denied him a fair trial; (7) he was denied his sixth amendment right to confront and cross-examine witnesses when the State elicited hearsay testimony that Smith told his girlfriend that if anything happened to him, he would be with the defendant; (8) his rights of confrontation were violated when a police officer testified that he spoke with Milbon Lockridge, a convicted accomplice who did not testify about the murder, which led to the officer's investigation of him; (9) he was denied the opportunity to present a defense when his alibi witness was stricken because she was allegedly not disclosed as an "alibi witness"; (10) the trial court erred when it struck all of his alibi witness' testimony and, if it did, whether it erred in striking all of it when some of it did not pertain to the alibi; (11) reversible error was committed in the State's closing argument; (12) the trial court erred in refusing to allow him to call a police officer as a witness for the purpose of impeaching the officer with his own police report; (13) the trial court erred in refusing to grant a hearing on his oral motion to suppress an in-court identification; and (14) the trial court further made errors in admitting certain evidence and

not admitting other evidence, and by sustaining objections to his closing argument.

The defendant also raises as issues pertaining to his sentencing hearing whether: (1) he was eligible for the death penalty; (2) his eighth amendment right to a fair sentencing hearing was denied when Smith's girlfriend was allowed to state that she was pregnant when he was killed, and when a photo of Smith and his child were admitted into evidence; (3) the State misstated the law and the evidence at the first stage of sentencing, thus denying defendant a fair sentencing hearing; (4) he was denied a fair sentencing hearing at the second stage when he was not allowed to show that a third party had recently threatened Smith, and that the third party had the opportunity to convince key witnesses to falsely implicate the defendant; (5) the trial judge denied him a fair sentencing when he made several statements during *voir dire* that the jurors were not responsible for imposing the death penalty; (6) he had a right of allocution; (7) he was denied a fair sentencing when the State was not limited to one closing argument at sentencing; (8) he was denied an impartial jury when the judge refused to ask jurors whether, if they found him guilty, they would automatically impose the death penalty; (9) he was denied a fair sentencing when the jury was told to disregard sympathy; and (10) he was denied a fair sentencing when evidence of charged, but unconvicted, crimes was admitted.

The defendant also raises issues as to the constitutionality of the death penalty statute, as well as to whether the trial court erred in denying his *pro se,* posttrial motion alleging ineffective assistance of counsel.

On December 17, 1985, at about 9:15 p.m., police officers responded to a radio dispatch regarding a shooting. Chicago police officer Thomas Kampenga testified as follows: that he and his partner, Officer Robert Skahill, found the victim, David Smith, lying in a pool of blood;

that he noticed several gunshot wounds to Smith's head; and that he saw a clear plastic bag containing a white powder lying next to the body. Both Officers Kampenga and Skahill testified that they had earlier seen the defendant and Smith exit the building where Smith lived, enter a grocery store across the street, and leave the store a short time later. Officer Skahill said that, as he was interviewing people around the building where Smith lived, he only noticed Smith leave the building, with the defendant following him. Officer Kampenga further stated that since he knew where Smith lived, he and his partner went to his apartment and informed his live-in girlfriend that he had been killed; she told them that Smith may have been with the defendant; and their subsequent search for the defendant was not successful.

Lashone Joyner testified as follows: that she was Smith's girlfriend and they lived together; that on December 17, 1985, at 4 p.m., she was home alone cooking when two men whom she knew only as "B-Bop" and "Poncho" visited; that she had known the men since 1975 from visiting their disco at the El Rukn Temple; that the men asked if Smith was home, and she told them he was not; that later that evening Smith came home, and then went out again; that at about 8 or 8:30 Smith came home alone, but then let the defendant (whom she knew only as "Tate") in; that she had known defendant for seven or eight years, and that he and Smith were friends; that she overheard defendant tell Smith that he had something for them to do; and that, as he left the apartment, Smith told her that "if anything happen [sic] to him, he would be with [defendant]."

Dr. Eupil Choi, an assistant Cook County medical examiner, testified that Smith was killed from multiple gunshot wounds to the head, and that he found six bullets in Smith's head.

Peter Poole, a forensic chemist then employed by the Chicago police department, testified as follows: that he performed a series of tests on the bag of white powder found next to Smith's body; that based on those tests, he determined that the powder did not contain any controlled substance or common adulterants; and that the substance appeared to have the color and consistency of flour.

Chicago police detective John Robertson testified as follows: that four months after Smith's murder, he was working on an unrelated case and he had become quite familiar with the El Rukn street gang; that as part of that investigation he spoke with Milbon Lockridge (nicknamed "Poncho"); that Lockridge told an assistant State's Attorney (as well as a grand jury), in his presence, about defendant's involvement in Smith's murder; that he then secured a warrant for defendant's arrest; that he later learned that defendant was in custody in LaPorte County, Indiana; and that he visited defendant in the LaPorte County jail, where he was being held under the alias "Larry Tate" and informed him of the arrest warrant. Officer Robertson also stated that he later learned that the defendant had confessed to an inmate, Stephen William Benjamin (Benjamin), at the LaPorte County jail. Robertson further testified that he went to the prison with a photo array, and Benjamin identified the defendant as the person who confessed to the murder.

Benjamin testified that he was in the LaPorte County jail in May 1986, serving a 115-day sentence for driving while intoxicated. He said that on a Saturday evening in mid-May, he had a conversation with the defendant, whom he then knew as "Larry Tate." According to Benjamin, the defendant told him: that there was a "hold" on him from Chicago for a murder that he and two other El Rukn gang members, B-Bop and Poncho, had commit-

ted; that he had been paid by "a big dope dealer" $2,000 before and $2,000 after he murdered a man that defendant called "Swift"; that on the night of the murder, he had placed a bag of flour in an abandoned apartment, and then went to Swift's house to pick him up; that he wanted Swift to believe that the bag contained cocaine; that when he picked Swift up, he told him that he had some cocaine for them to pick up; that he and Swift then walked to the abandoned apartment; that in the meantime, B-Bop was at the apartment to make sure that "the hit went down," and either B-Bop or Poncho was in the the getaway car; and that as Swift finished tasting the flour, defendant pulled out a .357 and shot Swift five or six times in the head.

Benjamin also testified that the defendant told him that he was going to attempt to escape from the La-Porte County jail during a trip to the dentist office by killing the guards. He said that defendant told him that B-Bop would meet him and that they would go back to Chicago to "take care of all of the witnesses." Shortly after Benjamin had this conversation, he told a jail guard the substance of his conversation with the defendant, and was transferred to another cell block in the prison. He further testified that he was not promised anything in exchange for his testimony, as he was scheduled to get out of the LaPorte County jail in June 1986 anyway.

Constance Smith, the victim's sister, testified to the following: that she was at the victim's apartment at 7:50 p.m. on the night that he was murdered; that she stayed at the apartment for approximately 20 minutes; and that she knew the defendant and did not see him at the apartment during that time period. Defendant's girlfriend, Barbara Baker, testified that defendant was at her house on the night of the murder.

Sergeant Clayton Jordan of LaPorte County testified that according to his records, Benjamin was housed in Cell Block 5 South of the county jail, while, at the same time, defendant was housed in Cell Block 5 South Central. He also said that inmates were not allowed to mingle with inmates from other cell blocks.

Following closing arguments, and a short deliberation, the jury found defendant guilty of murder. At the first phase of defendant's sentencing hearing, the only evidence presented was a certified copy of defendant's birth certificate, establishing that he was at least 18 years of age at the time the crime was committed. The State argued that the only issue at this phase of sentencing was the defendant's age, as the jury, by the nature of its verdict, had already determined that it was a "contract murder." Following deliberations, the jury found the defendant eligible for death penalty. At the second stage of the sentencing hearing, after the State presented evidence of defendant's prior convictions, and defendant presented mitigating evidence (including the testimony of a psychologist who said defendant had rehabilitative potential but an antisocial personality), the jury sentenced defendant to death.

## PRETRIAL ISSUES

The first issue that defendant raises is whether or not a *Batson* violation occurred. During *voir dire*, the defense moved for a mistrial because the State had used peremptory challenges to excuse two of three potential African-American jurors who had been questioned. The trial court ruled that the defendant had established a *prima facie* case of racial discrimination under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.

The prosecutor explained that he excused potential juror Pearline McGee because of a "hunch" he had about

her. He said that he guessed from the way that she answered the court's questions about her previous jury service that she had reached a verdict of "not guilty" in that trial. He also stated that McGee worked at the post office, and that he "had bad luck with post office employees being on juries."

Regarding potential juror Peter Reeves, the prosecutor stated that he excluded him because he was unemployed, and had been a resident at his current address for only five years, thus not having sufficient ties to the community. The prosecutor also said that Reeves failed to fill out his juror card completely. After hearing these explanations, the trial court held that the prosecutor did not arbitrarily exclude African-American potential jurors.

The question has been properly placed before this court, as the defendant objected to the potential jurors' exclusion at trial and in his post-trial motion for a new trial. The State argues that the trial court improperly concluded that defendant had established a *prima facie* case of discrimination. This court has held that "the initial determination of whether a *prima facie* case has been established is left to the judgment of the trial judge, who is in a superior position to determine whether the prosecutor's exercise of peremptory challenges was motivated by group bias." (*People v. Evans* (1988), 125 Ill. 2d 50, 66-67.) Based on this court's extensive review of the record, no reason can be found not to defer to the trial court's judgment that a *prima facie* case had been established.

The issue then narrows down to whether or not the trial court erred in accepting the prosecutor's explanations for the peremptory challenges. The explanations the State gives must be "clear, reasonably specific, legitimate, and nonracial in order to dispel the presumption created by the *prima facie* case," and this court will

usually give great deference to the trial court's findings. (*People v. Hope* (1990), 137 Ill. 2d 430, 467.) The trial court was clearly correct in determining that the prosecutor dismissed potential jurors McGee and Reeves for legitimate, nonracial reasons.

The prosecutor's explanation that he dismissed prospective juror McGee on the basis of her demeanor is sufficient. (See *People v. Young* (1989), 128 Ill. 2d 1, 20-21 (where the court found that a prosecutor's explanation, that he challenged a prospective juror because of his demeanor, was sufficient to rebut a *prima facie* violation of *Batson*).) The prosecutor's main problem with McGee was her demeanor in discussing a prior time when she served on a jury. Additionally, a close reading of the record shows that the prosecutor's remarks concerning McGee's employment were meant as an afterthought and, thus, are of no consequence.

As to potential juror Reeves, the prosecutor's remarks, that he was concerned with his lack of ties to the community, is sufficient to rebut defendant's *prima facie* showing of a *Batson* violation. Unless the decision is against the manifest weight of the evidence, the question of whether or not the prosecutor was credible in offering his reasons is a question best left to the trial judge, who is in the best position to determine credibility. (*Hope*, 137 Ill. 2d at 467.) After reviewing the record, we find that the defendant did not meet his burden of showing that the trial court abused its discretion.

The defendant also argues that the trial court erred by excusing potential jurors who expressed reservations about capital punishment, and by refusing to further question a juror as to whether his attackers in a beating had been African-American. With the entire venire seated in the courtroom, the trial court asked that potential jurors who had reservations about the death penalty raise their hands. The trial judge then specifically ques-

tioned each of these potential jurors regarding their views and decided whether to dismiss them.

One of the potential jurors stated that he did not believe in capital punishment and would have great difficulty in voting for the death penalty. Then, the following colloquy between the trial judge and the potential juror took place:

"PROSPECTIVE JUROR: Five years ago, I was a juror, and the same question [*sic*]. When I was examined whether I would be a proper juror, I was dismissed because the attorney felt I would not be qualified.

THE COURT: Under the circumstances you feel you could not be fair and impartial because the death penalty may be imposed?

PROSPECTIVE JUROR: I don't think I would be fair."

Over defense counsel objections, the trial judge excused this prospective juror.

A second potential juror stated that she did not believe that she could vote for the death penalty. When the trial judge asked her if she would automatically vote against the death penalty, she stated that she would, as a moral statement. Over defense counsel's objections, this potential juror was also excused.

"*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, prohibits the exclusion for cause of prospective jurors who express only general objections to the death penalty. In *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, the Court held that a juror may not be excused unless his or her views ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*People v. Gacho* (1988), 122 Ill. 2d 221, 239.)

The trial court is in the best position to determine whether a prospective juror will be fair. As such, "deference must be paid to the trial judge who sees and hears

the juror." *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 83 L. Ed. 2d 841, 853, 105 S. Ct. 844, 853.

In the case of the first prospective juror, the trial court had ample reason to conclude that he would not fairly weigh the evidence as a consequence of his views of the death penalty. His response is similar to that of prospective jurors in other cases who have been found to have been properly dismissed. See, *e.g., People v. Gacho,* 122 Ill. 2d at 238-40 (when asked whether he would consider imposition of the death penalty, the prospective juror replied: "No, I would rather not"); *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 431 (when asked whether he could impose the death penalty, the prospective juror stated: "I don't think I have a right to do that").

As to whether the trial court should have further questioned the second potential juror, prior to dismissing her, the issue has been waived, as defendant failed to raise it in his post-trial motion for a new trial. *"Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphasis in original.) *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

Defendant also raises issues regarding the *voir dire* of juror Mark Armgardt. Armgardt said that he had been the victim of a beating five years earlier. The trial court refused defendant's request to ask him whether or not his assailant had been African-American. Defendant argued that because Armgardt may have been the victim of an interracial crime, he may be inclined to impose the death penalty against an African-American defendant. Defendant raised his objection at trial, but failed to raise it in his post-trial motion for a new trial. Thus, on appellate review, as the issue does not rise to the level of plain error (107 Ill. 2d R. 615(a)), it is waived. *Enoch,* 122 Ill. 2d at 186.

## TRIAL

As to errors committed during the trial, the defendant initially argues that the State failed to find him guilty beyond a reasonable doubt. In support of this contention he argues that because there is no physical evidence linking him to the crime, and because his alleged confession to Benjamin never took place, there was not enough evidence to convict him beyond a reasonable doubt.

"A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. [Citations.] It is not our function to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt. [Citations.] Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact." (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43.)

Upon review, once a defendant is found guilty of a crime, all of the evidence is to be considered in a light most favorable to the prosecution. *People v. Collins* (1985), 106 Ill. 2d 237, 261, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Applying the aforementioned principles to the instant case, we conclude that there was sufficient evidence to support the jury's verdict. Here, the essential issue is the credibility of Benjamin's testimony concerning defendant's admissions. Defendant argues: that it is unlikely that he (a member of Chicago's El Rukn street gang) would have confessed to Benjamin (an Indiana native who was serving a short sentence for driving while intoxicated); that the physical evidence shows that the bullets remained in the victim's head, and if defendant

had used a .357-caliber gun (as Benjamin testified that he did), then the bullets would have gone through Smith's head; that there was no evidence, other than Benjamin's testimony, of a contract; and that there were other inconsistencies in Benjamin's testimony.

The jury was exposed to all of the potential infirmities in Benjamin's testimony that defendant presents. The determination of credibility of witnesses and evidence is exclusively within the province of the jury, and the jury will resolve any conflicts. (*Collins*, 106 Ill. 2d at 261-62.) As the jury was made fully aware of the infirmities of Benjamin's testimony and other circumstantial evidence pointing towards the defendant's guilt, we cannot say that its conclusions were unreasonable. Therefore, he was properly found guilty beyond a reasonable doubt.

The defendant next argues that he was denied a fair trial when the trial court granted the State's motion *in limine* which excluded any evidence that Elbert Dunnigan (a third party) had threatened Smith prior to the murder, and that he had the opportunity to convince Benjamin to lie and implicate the defendant in the murder. As an offer of proof, the defendant stated that Elbert Dunnigan had threatened Smith with a handgun one week prior to the murder, and that he, having been housed in the LaPorte County jail at the same time as Benjamin, had persuaded Benjamin to falsely implicate the defendant. The trial court then granted the State's motion *in limine*.

The trial court sustained the State's relevance objections when defendant asked Sergeant Clayton Jordan, head of security for the LaPorte County jail, whether Benjamin and Dunnigan had been housed together in (or were even in the same cell block of) the jail. The trial judge also did not allow the testimony of Frank Brown. In an offer of proof, the defendant told the court: that Mr. Brown had known the defendant, Smith, and Dunni-

gan for a number of years; that Brown had seen Dunnigan threaten Smith in the past; and that while Brown was in the LaPorte County jail, Dunnigan had twice asked him to claim that the defendant had admitted to committing Smith's murder. The trial court also did not allow the defendant to call two witnesses who claimed to have seen Dunnigan threaten Smith.

The defendant's reliance on Brown's proffered testimony is misplaced because none of it was ever going to be introduced at trial because Brown invoked his fifth amendment right to refuse to testify based on the possibility of self-incrimination. Thus, the defendant's theory that Dunnigan had committed the murder is based solely on the testimony of one witness who would testify that she saw Dunnigan threaten Smith one week prior to the murder. The only other evidence implicating Dunnigan in Smith's murder would have been the testimony of a jail guard as to the location of Dunnigan's cell at the LaPorte County jail.

"An accused * * * may attempt to prove that someone else committed the crime with which he is charged [citation], but this right is not without limitations." (*People v. Ward* (1984), 101 Ill. 2d 443, 455.) This court has long observed:

> "One accused of crime may prove any fact or circumstance tending to show that the crime was committed by another person than himself. [Citations.] It is, of course, difficult, in dealing with evidence of this character, to define the precise limits which must control its admission. If it is too remote in time to throw light on the fact to be found it should be excluded." (*People v. Nitti* (1924), 312 Ill. 73, 90.)

This court has also found that evidence should be excluded if it is too speculative. *People v. Dukett* (1974), 56 Ill. 2d 432, 450.

Defendant argues that under *Nitti*, evidence that Dunnigan had threatened Smith one week prior to the murder is highly relevant. The excluded evidence in *Nitti* showed that two weeks before his death, the victim had an argument with his son, when the victim refused to give him $500. The son had kicked and beat the victim until he was nearly unconscious. The evidence showed that the son then disappeared and did not reappear until a week later. The court found that this evidence was not too remote to be relevant. *Nitti*, 312 Ill. at 90.

However, in the instant case, there is far less evidence that links Dunnigan to the murder. The evidence that Dunnigan had threatened Smith shows a remotely speculative relationship, at best.

The testimony of Sergeant Jordan as to which cell block Dunnigan was in at the LaPorte County jail was also properly excluded. The fact that Dunnigan may have been incarcerated in the same cell block as Benjamin does not show that he persuaded (or even talked to) him about falsely implicating the defendant in Smith's murder. No other evidence linking Benjamin and Dunnigan had been offered. As earlier stated, speculative evidence may be properly excluded at the discretion of the trial judge, and this evidence was speculative at best.

The defendant next contends that the trial court erred when it allowed two defense witnesses to refuse to testify for fear of self-incrimination, without determining whether the witnesses could have provided certain limited testimony without incriminating themselves.

Prior to trial, the State made a motion *in limine* to preclude Henry Evans from testifying. The trial court reserved judgment on the matter. At trial, the defendant informed the court that Evans had criminal charges pending against him in Cook County and that, according to him, an unknown representative of the State's Attor-

ney's office had threatened him regarding his charges if he testified on behalf of the defendant. The defendant did not make an offer of proof as to what Evans would testify to, but he alluded that it would be to the aforementioned threats. The trial judge then called in Evans and his attorney. The judge examined Evans, and he then invoked his fifth amendment right not to testify based on the possibility of self-incrimination.

Defendant then attempted to call Frank Brown. After finding out that there were criminal charges pending against Brown in Cook County, and a warrant had been lodged against him in Indiana, the trial judge asked Brown if he wished to talk with separate counsel. After a meeting with appointed counsel and a second examination by the judge, Brown invoked his fifth amendment right not to testify based on the possibility of self-incrimination. The defendant then made an offer of proof that Brown would testify: that he has known defendant, Smith, and Dunnigan for a number of years; that Dunnigan and Benjamin were housed in the same cell block at the LaPorte County jail; that he had knowledge that Dunnigan had threatened Smith; and that, on two occasions, Dunnigan asked him to falsely say that the defendant had committed the murder, in exchange for help in his Indiana armed robbery case.

We do not need to address this issue, as it was waived by the defendant. As to both Evans and Brown, the defendant failed to properly object at trial and to raise the issue in his post-trial motion. Therefore, the issue is waived on review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) The issue is also not plain error, as we have already determined that the evidence was not closely balanced, and any error was not of a magnitude to deny defendant a fair trial. *People v. Young* (1989), 128 Ill. 2d 1, 47.

Defendant next argues that he was deprived of his right to present a defense when the trial court informed Brown and Evans about the consequences to their pending cases if they testified on the defendant's behalf. As earlier noted, both Evans and Brown had cases pending against them in the circuit court of Cook County when they were called to testify for defendant. The trial court advised each of them of the consequences of testifying (as related to their own cases) and had each of them consult with an attorney. Both Brown and Evans then asserted their fifth amendment rights and refused to testify on behalf of the defendant.

The defendant has waived this issue due to his failure to timely object at trial as well as raise the issue with specificity in his post-trial motion. (*Enoch*, 122 Ill. 2d at 190.) Furthermore, the issue does not rise to the level of plain error, as we have already determined that the evidence was not closely balanced, and any error was not of such magnitude as to deny defendant a fair trial. *Young*, 128 Ill. 2d at 47.

The defendant also contends that the trial judge deprived him of his right to present a defense by admonishing two defense witnesses, Constance Smith and Harry Evans, as to the consequences of committing perjury, while the court did not similarly admonish any of the State's witnesses. The defendant argues that the trial judge's admonitions show that that court was biased against defense witnesses.

The defendant failed to raise the issue at trial or in his post-trial motion for a new trial. Therefore, the issue is waived. (*Enoch*, 122 Ill. 2d at 190.) The waiver rule serves an important public policy because a timely objection will allow the circuit court to correct any errors and "a party who fails to object cannot obtain the advantage of receiving a reversal by failing to act." (*People v. Reid* (1990), 136 Ill. 2d 27, 38.) This issue does not rise to the

level of plain error since we have already determined that the evidence was not closely balanced and the alleged error was not of a magnitude as to deny the defendant a fair trial. *Young*, 128 Ill. 2d at 47.

The defendant next argues that the trial judge's behavior towards defense counsel had the effect of denying him a fair trial. Defendant gives numerous examples in which he alleges that the trial court acted improperly: by displaying hostility to defendant's attorneys; by belittling defendant's attorneys; by conducting an in-court identification of the defendant; by arguing evidentiary objections before the jury; and by questioning defense witnesses. The State argues that defense counsel was treated fairly and cites the following examples as evidence that the trial judge did not treat the defendant unfairly: sustaining defendant's objections; admonishing the prosecutor; allowing defendant a continuance to obtain a transcript; and allowing defendant's untimely filed *pro se* motion.

The defendant has waived these issues by not objecting to them at the time the improper actions took place. Furthermore, defendant's post-trial motion contained merely vague, general allegations of error. This court has held that both a contemporaneous objection and a specific allegation in a post-trial motion are necessary to preserve an error for review. (*Enoch*, 122 Ill. 2d at 190.) We additionally find that since the evidence in this case has already been found not to be closely balanced, and the alleged errors were not of a magnitude as to deny defendant a fair trial, they are not plain error. *Young*, 128 Ill. 2d at 47.

The defendant next contends that Lashone Joyner's testimony, that Smith had told her that if anything happened to him, he would be with defendant, was inadmissible hearsay.

Defendant's arguments regarding the testimony in question, references to the testimony by the prosecution in closing argument, and the absence of a relevant limiting instruction have all been waived. (See, *e.g., People v. Thomas* (1990), 137 Ill. 2d 500, 524.) The defendant did not object to Joyner's testimony at trial and did not raise the issue in a post-trial motion, thus waiving objections. (*Enoch*, 122 Ill. 2d at 186.) The defendant did object following the prosecutor's second reference to Joyner's testimony, but he did not set forth this error with specificity in his motion for a new trial, and thus waived that objection on review. (*Enoch*, 122 Ill. 2d at 190.) The defendant also failed to tender a limiting instruction regarding Joyner's testimony, so he cannot raise the issue on appeal. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 543.) Finally, the issue will not be addressed as plain error because we have already found that the evidence was not closely balanced, and any error was not of a magnitude as to deny the defendant a fair trial. *Young*, 128 Ill. 2d at 47.

The defendant also contends that Detective Robertson's testimony, that he had a conversation with Milbon Lockridge ("Poncho") about defendant's case and thus subsequently began searching for him, was erroneously admitted, violating his right of confrontation under the sixth amendment. We find that those statements were not inadmissible hearsay, and therefore were properly admitted.

At trial, Detective Robertson testified as follows: that in early April 1986, while working on an unrelated case, he spoke with Lockridge about decedent's murder; that he then took Lockridge for an interview with an assistant State's Attorney; that after the interview, he and the assistant State's Attorney brought Lockridge to the grand jury; that later that same day he was assigned to the murder case; that later that month he obtained a

warrant for defendant's arrest for the murder of Smith; and that he later learned that the defendant was in the LaPorte County jail, and he lodged the warrant there.

At no time did Detective Robertson testify as to the substance of any of the statements Lockridge had made to him. Defendant, however, argues that Robertson's testimony inferentially revealed that Lockridge had implicated the defendant in the murder.

This court resolved this issue in *People v. Gacho* (1988), 122 Ill. 2d 221, 248-49. In that case, this court held:

"Had the substance of the conversation that Coakley [the detective] had with Infelise [the witness] been testified to, it would have been objectionable as hearsay. The testimony of Coakley, however, was not of the conversation with Infelise, but to what he did and to investigatory procedure. (*People v. Williams* (1977), 52 Ill. App. 3d 81, 87-88; see also *People v. Wright* (1974), 56 Ill. 2d 523.) As our appellate court stated in considering similar testimony, 'Such testimony is not hearsay because it is based on the officers' own personal knowledge, and is admissible although the inference logically to be drawn therefrom is that the information received motivated the officers' subsequent conduct.'" *Gacho*, 122 Ill. 2d at 248, quoting *People v. Hunter* (1984), 124 Ill. App. 3d 516, 529.

Defendant argues that *Gacho* is distinguishable from the instant case because in *Gacho* the police officer spoke with a victim of the crime, while in this case the officer spoke with a codefendant. We find the defendant's argument to be lacking in persuasiveness because, in both *Gacho* and the instant case, the officer's testimony did not contain hearsay, and simply showed the conduct of the officer's investigation.

The defendant next contends that the trial court improperly precluded his alibi witness, Barbara Baker, from testifying, where the defendant's discovery re-

sponses indicated that he would present an alibi and separately showed that Baker would testify. Baker testified that the defendant had been at her house at about 8 p.m. on the night of the murder. The prosecutor then objected when defense counsel asked her how long the defendant was with her, because defense counsel had not notified them of this alibi. According to the prosecution, the defendant had provided them with a different alibi defense, requiring the testimony of a different witness.

In response, defense counsel explained that two witnesses had told them that they would testify regarding the defendant's alibi. The night before Baker's testimony, one of the witnesses told defense counsel that she had been lying, whereupon they decided to use Baker as an alibi witness. Defense counsel's excuse for not informing the prosecution that they were changing both the alibi defense and witness was that they "overlooked in [their] rush saying anything today" because they were "busy doing things in the trial this morning."

The trial judge ruled that he would preclude Baker from testifying because there was no way for the prosecution, at that late date, to effectively assemble and present rebuttal evidence, and because he felt it was clear that the defense counsel knew of the alibi testimony in question, but deliberately withheld disclosing the information during the hearing on the State's motion *in limine* prior to Baker's testimony, choosing rather to surprise the prosecution during Baker's direct examination.

In pertinent part, Supreme Court Rule 413 states:

> "Subject to constitutional limitations and within a reasonable time after the filing of a written motion by the State, defense counsel shall inform the State of any defenses which he intends to make at a hearing or trial and shall furnish the State with the following material and information within his possession or control:

(i) the names and last known addresses of persons he intends to call as witnesses \* \* \*
 \* \* \*

(iii) and if the defendant intends to prove an alibi, specific information as to the place where he maintains he was at the time of the alleged offense." 107 Ill. 2d R. 413(d).

Additionally, Supreme Court Rule 415 provides, in part:

"(b) Continuing Duty to Disclose. If, subsequent to compliance with these rules or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall be notified.
 \* \* \*

(g) Sanctions.

(i) If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." 107 Ill. 2d R. 415.

Under Rule 413(d)(iii), the defendant had an obligation, prior to trial, to reveal to the prosecution his alibi, that he was with Baker at the time of the murder, prior to trial. He did not reveal this information in the pretrial discovery. Pursuant to Rule 415(b) the defendant had a continuing duty to promptly notify the State or trial court (if discovered during trial) as to a new alibi. The defendant clearly did not meet his obligation, thus violating Rules 413 and 415.

The only matter, with respect to this issue, left to be decided is whether the trial court abused its discretion in

precluding Baker from testifying. The trial court was clearly acting within its discretion, as Rule 415(g)(i) specifically authorizes a trial court to exclude evidence as a sanction. See, *e.g., People v. Partee* (1987), 157 Ill. App. 3d 231, 252-53 (court found that the trial court acted within its discretion when it excluded the testimony of an alibi witness where the *pro se* defendant did not disclose specific information concerning the alibi, in violation of Rule 413(d)(iii)).

The defendant argues that the sanction of preclusion was too harsh, as the trial court could have applied a lesser sanction. This issue was discussed in *Taylor v. Illinois* (1988), 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646. In *Taylor*, on the second day of trial, the defense attorney made an oral motion to amend his discovery answers to include two additional witnesses. Upon inquiry from the trial judge as to why the motion should be granted, counsel represented that he had just been informed about these witnesses. The following day, the first witness appeared for an offer of proof and revealed that he had actually met with defense counsel a week before the trial started. The trial judge then did not allow either of the witnesses to testify due to defense counsel's blatant violation of discovery rules.

The Supreme Court affirmed the trial court's exclusionary sanction. (*Taylor*, 484 U.S. at 402, 98 L. Ed. 2d at 806, 108 S. Ct. at 648-49.) The Court reasoned that the sanction of preclusion serves an important purpose, noting:

> "One of the purposes of the discovery rule itself is to minimize the risk that fabricated testimony will be believed. Defendants who are willing to fabricate a defense may also be willing to fabricate excuses for failing to comply with a discovery requirement. The risk of a contempt violation may seem trivial to a defendant facing the threat of imprisonment for a term of years. A dishon-

est client can mislead an honest attorney, and there are occasions when an attorney assumes that the duty of loyalty to the client outweighs elementary obligations to the court." *Taylor*, 484 U.S. at 413-14, 98 L. Ed. 2d at 813, 108 S. Ct. at 655.

In this case, the trial court obviously felt that preclusion was the only effective sanction. That decision was clearly within its discretion, and we cannot find that the trial court abused that discretion.

In regards to Baker's testimony, the defendant also contends that the trial court erred when it struck all of her testimony. The defendant argues that Baker's testimony, that she saw Smith sell drugs and use cocaine, was relevant, because the bag of powder found near Smith's body was not a controlled substance. He argues that this testimony would help to establish his theory that Smith had been murdered by a disgruntled drug buyer whom he had attempted to defraud.

The State argues that the defendant has waived this issue. However, contrary to the State's allegations, the defendant has preserved this issue for review, pursuant to *Enoch*. Immediately after striking Baker's testimony, the trial court adjourned for the day. The next morning, the defendant objected to the striking of Baker's testimony immediately prior to the resumption of the trial. Thus, he complied with the contemporaneous-objection requirement. Additionally, he alleged that the striking of Baker's entire testimony was error in his post-trial motion. As his objection was actually to the striking of the *entire* testimony, this was as specific as defendant could get. Thus, he was able to preserve the error for review, by meeting the requirement that the error be objected to specifically in a post-trial motion. *Enoch*, 122 Ill. 2d at 186.

Following the State's objection to the use of Baker as an alibi witness and in the presence of the jury, the trial court stated:

"Ladies and Gentlemen, I would like to advise you that certain testimony of the witness is to be disregarded, it is to be stricken, you are not to consider it, you are not to draw any inferences from it or speculate any further consideration of the testimony that this witness has given."

It is patently clear, from looking at this statement in the context it was given, that the trial judge was simply instructing the jury not to consider Baker's testimony as it related to defendant's alibi.

Furthermore, defendant invited the error and cannot now complain of it on appeal. (See, *e.g., People v. Miller* (1983), 120 Ill. App. 3d 495, 501 (defendant invited error by failing to request that the trial court *voir dire* the jury about a newspaper article discovered in the possession of one of the jurors, as that is the most frequently utilized method of avoiding an error).) Here, the day following the occurrence of the alleged error, the defendant made an oral motion for a new trial, contending that the trial judge struck all of Baker's testimony. The trial judge denied the motion. The defendant could have then asked that the court reporter read the complained-of remarks, so that the trial court could clarify its position. He did not make this request, thus allowing the jury to continue to labor under what he perceived to be the belief that it was not to consider any of Baker's testimony. As the defendant invited the error, his objection is waived on review.

Defendant next contends that he was denied his due process right to a fair trial because the prosecutor made five allegedly improper comments during closing argument. At the outset, it should be noted that prosecutors have a great deal of latitude in making closing argu-

ments (*People v. Morgan* (1986), 112 Ill. 2d 111, 131; *People v. Stock* (1974), 56 Ill. 2d 461, 467), and the trial court's determination as to the propriety, and possible prejudicial effect, of the prosecutor's closing argument will be followed, absent a clear abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.) In order for a remark to be deemed reversible error, the complained-of remark must have resulted in substantial prejudice to the accused, such that the verdict would have been different had it not been made. (*Morgan*, 112 Ill. 2d at 132.) "In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety and the complained-of comments must be placed in the proper context." *People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76.

The first alleged error is that the prosecutor improperly remarked, four times, that the defendant was smiling as he sat at the defense table. The first two references in question were as follows:

"[ASSISTANT STATE'S ATTORNEY]: Detective Robertson explained to you about the El Rukns street gang, about their temple at 39th and Drexel, about General B-bop, about Poncho and about Derrick Morgan. And he can sit there and smile at you ladies and gentlemen, but don't let that intimidate you, you sworn [*sic*] to take an oath—

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Objection overruled.

[ASSISTANT STATE'S ATTORNEY]: You have been sworn to take an oath, you sit here as Jurors and you have an obligation to listen to the evidence despite whatever the Defendant has a right to do here in Court.

[DEFENSE COUNSEL]: Objection, your Honor, the Defendant didn't try to do anything here in Court. I object to this line of argument.

> THE COURT: The objection is overruled, it will stand. The jury has an opportunity to observe and if in fact there are any statements made by either side that are not consistent with what is happening in this Courtroom they will disregard it completely. Accordingly you may continue with your statement."

It is clear from the preceding remarks that the prosecutor was not referring to the defendant's demeanor. These comments were not error.

Later, it was argued:

> "[ASSISTANT STATE'S ATTORNEY]: Again, how would Benjamin know unless this man, this smiling man here today told him that is what happened.
>
> [DEFENSE COUNSEL]: Objection, Your Honor.
>
> THE COURT: Objection sustained. Mr. Gambony [the Assistant State's Attorney], you may comment on evidence but I ask you to refrain from any other tactics. Proceed from there."

Because the trial court sustained the defendant's objections in the presence of the jury, any arguable error from the prosecutor's references to the defendant's smiling was cured. Further, the defendant did not request that the trial judge instruct the jury or declare a mistrial. (*People v. Hooper* (1989), 133 Ill. 2d 469, 488.) The jury was further instructed that the closing arguments were not evidence. (*Hooper*, 133 Ill. 2d at 492.) Thus, any possible error that may have been brought about by the prosecution's references to the defendant's smiling was harmless, and thus not cause to reverse the judgment. *People v. Caballero* (1989), 126 Ill. 2d 248, 273.

The defendant also argues that comments by the prosecutor that the jury should support Benjamin for coming forward to testify were prejudicial. He argues that this comment appealed to the passions and prejudices of the jury by asserting that, without this jury's support, witnesses in future cases would not come forward to testify. Although the defendant objected at trial,

he failed to specifically set forth this error in his post-trial motion, thus waiving the issue on appeal. (*People v. Fields* (1990), 135 Ill. 2d 18, 59-60.) We will also not examine the issue as plain error, as the evidence was not closely balanced and the remarks were not so inflammatory as to deny the defendant a fair trial. *Fields*, 135 Ill. 2d at 60.

The defendant's third point of error in the prosecutor's closing argument is that the prosecutor improperly commented about Benjamin's courage in testifying. Defendant argues that this was improper because no evidence was presented that Benjamin was in any danger. This point of error has been waived, as the defendant failed to object at trial, and did not raise it in his post-trial motion. (*Fields*, 135 Ill. 2d at 59-60.) The point of error is also not plain error, as we have already found that the evidence was not closely balanced and the remark was not so inflammatory as to deny the defendant a fair trial. *Fields*, 135 Ill. 2d at 60.

The defendant's next point of error is that the prosecutor prejudicially commented that no eyewitnesses to the murder came forward because he had threatened or intimidated them. There was no evidence in the record that the defendant had threatened witnesses, or that there even were eyewitnesses to the murder. This point of error is waived because it was not specifically raised in the defendant's post-trial motion. (*Fields*, 135 Ill. 2d at 59-60.) Further, as we have already determined that the evidence in this case was not closely balanced, and because the remarks were not so inflammatory as to deny the defendant a fair trial, the error does not rise to the level of plain error. *Fields*, 135 Ill. 2d at 60.

Concerning the prosecutor's closing argument, the defendant's final point of error is that the prosecutor referred to defense counsel's closing argument as "the mad rambling of a defense attorney," and "ridiculous"

(twice). As to the two complained-of comments that defense counsel's argument was "ridiculous," the error, in the first instance, is waived because the defendant failed to object to it at trial and raise it in his post-trial motion. (*Fields*, 135 Ill. 2d at 59-60.) The second complained-of comment is also waived because defendant failed to include it in his post-trial motion. (*Fields*, 135 Ill. 2d at 59-60.) Additionally, this alleged error does not rise to the level of plain error, as we have already determined that the evidence was not closely balanced, and the remark was not so inflammatory as to deny the defendant a fair trial. *Fields*, 135 Ill. 2d at 60.

As to the prosecutor's comment that the defense counsel's argument was "mad ramblings," defendant's objection was immediately sustained in front of the jury. The trial court further said:

"I ask you to refrain from using any such terminology, I heard no ramblings, he presented his case as he saw fit and I ask you refrain from making such comment."

Thus, any error in the statement was cured by the trial court, and since we are persuaded that there was ample evidence to find the defendant guilty, the remark was not reversible error. *Cisewski*, 118 Ill. 2d at 178.

Contrary to the defendant's contention, this remark is different from the one in *People v. Monroe* (1977), 66 Ill. 2d 317, where this court found that a prosecutor's comments that a defendant's closing argument was "preposterous" and "fraudulent," coupled with his expression of his opinion of the defense, was reversible error. (*Monroe*, 66 Ill. 2d at 323-24.) Rather, this case is more closely analogous to *People v. Cantrell* (1977), 55 Ill. App. 3d 270, where the court found that a sustained objection was enough to cure the prosecutor's comment that some of the defense counsel's cross-examination was "meaningless garbage talk." (*Cantrell*, 55 Ill. App. 3d at 275.) As in *Cantrell*, the prosecutor's comments in

the instant case, coupled with the trial court's admonish-ment, do not rise to the level of reversible error.

The defendant next contends that the trial court erred by not allowing him to call Detective Robertson as his own witness in order to impeach him with his police report (taken from his conversation with Benjamin at the LaPorte County jail). He argued that the police report stated that Benjamin told Robertson that he had his conversation with the defendant two or three days before Memorial Day 1986, and not in mid-May 1986, and that the police report would seriously impeach Benjamin's testimony as to when the conversation occurred, thus impeaching his entire testimony.

The State maintains that because Benjamin admitted, on direct examination, that he may have originally told the police that his conversation with the defendant took place in late May, as opposed to mid-May, and because the discrepancy as to when the conversation occurred was a collateral matter, the trial court properly precluded the defendant from calling Robertson for the purpose of impeaching him with his report.

The trial court's reasoning for holding that the defendant could not impeach Robertson with his own report was that a party cannot impeach his own witness. Initially, it should be noted that the trial court erred in telling defense counsel that a party in a criminal case cannot call a witness solely to impeach that witness. Under Supreme Court Rule 433, the examination of a hostile witness in a criminal case is governed by Supreme Court Rule 238. (107 Ill. 2d Rules 433, 238.) Furthermore, under Supreme Court Rule 238(a), "[t]he credibility of a witness may be attacked by any party, including the party calling him." (107 Ill. 2d R. 238(a).) Nevertheless, as a reviewing court, we can sustain the decision of a trial court for any appropriate reason, regardless of whether the trial court relied on those grounds and re-

gardless of whether the trial court's reasoning was correct. See *Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 148.

Whether Benjamin had his conversation with the defendant in mid-May 1986, or a few days before Memorial Day 1986, is plainly collateral to the case at hand. As the appellate court has noted, Supreme Court Rule 238 "does not grant permission to try collateral issues in order to prove the unreliability or untruthfulness of the witness." (*People v. Jones* (1986), 148 Ill. App. 3d 345, 351.) Thus, as the trial court could have based its exclusion on the "collateral issues" principle, the trial court's exclusion of Robertson, solely for the purpose of impeachment, was proper.

Defendant next contends that his due process rights were violated when the trial court refused to grant his request for a hearing on his oral motion to suppress the in-court identification by Benjamin. He argued that one of the prosecuting attorneys had brought Benjamin into the courtroom prior to his testimony, and pointed out the defense attorneys to him. In response, the prosecutor argued that Benjamin had previously identified the defendant from a photo array.

Benjamin testified that, when he originally spoke with the police about this case, he identified defendant's photograph from a photo array, and signed that photo. At trial, he picked the same photo out of a photo array shown to him, and identified his signature.

There is no *per se* rule that, under the due process clause of the fourteenth amendment, a trial court must hold a hearing outside the presence of the jury on the admissibility of identification testimony. (*Watkins v. Sowders* (1981), 449 U.S. 341, 66 L. Ed. 2d 549, 101 S. Ct. 654.) Furthermore, "[i]t is the reliability of identification evidence that primarily determines its admissibility." (*Watkins v. Sowders*, 449 U.S. at 347, 66 L. Ed. 2d at

555, 101 S. Ct. at 658.) An in-court identification need not be suppressed if the prosecution can show a sufficiently reliable, independent basis for the identification.

The trial court's denial of defendant's request for a hearing was proper, as the prosecutor clearly established that there was an independent basis for Benjamin's in-court identification: Benjamin's previous identification of the defendant from a photo array. Additionally, the defendant did not complain that the earlier photo identification was impermissible suggestive.

The case of *United States v. Davies* (7th Cir. 1985), 768 F.2d 893, is instructive because, in that case, the defendant complained that the in-court identification was unnecessarily suggestive. At the three tables in the courtroom, there were only three males and, according to the defendant, only he vaguely resembled the description that the witness had earlier given. The court found that the in-court identification was properly admitted because the witness had previously picked the defendant's picture out of a photo array. Thus, the likelihood of a misidentification in court was reduced. *United States v. Davies*, 768 F.2d at 903-04; see also *United States v. Mills* (11th Cir. 1983), 704 F.2d 1553, 1564 (court found that denial of a request for an *in camera* hearing was proper, when the prosecution had established a sufficient, independent basis to show that the in-court identification was correct).

The defendant next argues that the trial court erroneously excluded some evidence, and erroneously admitted other evidence. Because the defendant really raises four different claims, this court will examine each claim separately.

Initially, the defendant argues that the trial court erroneously excluded evidence that there was a large amount of drug traffic in the vicinity of the apartment where Smith's body was found. He argues that this evi-

dence would help to strengthen his theory that Smith, a known drug dealer, was murdered during a drug deal, by someone other than the defendant.

While a defendant in a criminal case may, certainly, attempt to prove any set of facts that tend to show that someone else committed the crime with which he is accused (*Ward*, 101 Ill. 2d at 455), such evidence should be excluded if it is too remote or too speculative (*People v. Dukett* (1974), 56 Ill. 2d 432, 450). The admission of such evidence lies "within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion." *Ward*, 101 Ill. 2d at 455-56.

Defendant's argument, that an unknown third person may have killed Smith during a drug deal gone bad, based purely on the fact that there is a great deal of drug traffic in the area where the body was found, is incredibly speculative. Clearly the trial court's ruling such evidence inadmissible was not an abuse of discretion.

The defendant also argues that the trial court improperly permitted Lashone Joyner (Smith's girlfriend) to testify that she was pregnant on the night of the murder, ar.: also improperly admitted photographs of Smith.

During direct examination, the prosecutor asked Joyner about her condition at the time of the murder and she stated that she was pregnant. Defendant objected, and the trial judge sustained the objection, specifically admonishing the jury to disregard Joyner's remark. On cross-examination, Joyner said that on the night of the murder, she did not tell the police that B-Bop and Poncho had stopped by the apartment. On redirect examination, she stated that she was pregnant and in a state of shock on the night of the murder, and that is why she forgot to tell the police about B-Bop and Poncho.

It is well settled that a party, on redirect examination, is allowed to question a witness as to matters

brought out during cross-examination, and questions may be asked which are designed to remove unfavorable impressions or references raised by cross-examination. (See, *e.g., People v. Chambers* (1989), 179 Ill. App. 3d 565, 577.) Furthermore, the scope of redirect examination is within the sound discretion of the trial judge. (*People v. Davis* (1981), 92 Ill. App. 3d 426, 428.) In this case, the prosecutor asked questions about Joyner's condition on the night of the murder, so as to remove any unfavorable impressions that may have resulted from her cross-examination testimony. Any references that the prosecution brought out about her pregnancy were clearly elicited to help explain why she was in such a state of shock that she forgot to tell the police about B-Bop's and Poncho's visit to her apartment.

Defendant also objects to the admission of "life" photographs of Smith. At trial, Marcia Alexander testified as follows: that she was Smith's sister; that she had last seen Smith alive approximately two weeks before the murder; and that, on the night of the murder, she viewed Smith's body at the Cook County morgue. At this point it was stipulated that if she were shown People's Exhibit No. 1 for identification, she would identify it as a picture of her brother when he was alive. It was further stipulated that she would identify People's Exhibit No. 2 for identification, as a picture of her brother as he looked deceased. Over defendant's objection, People's Exhibits Nos. 1 and 2 were admitted into evidence and submitted to the jury.

The decision whether or not to allow the introduction of photographs of a decedent in a murder trial is within the sound discretion of the trial court (*People v. Lefler* (1967), 38 Ill. 2d 216, 221), and when photographs are necessary to establish any fact in issue, they are relevant (*People v. Speck* (1968), 41 Ill. 2d 177, 202). In the instant case, as in *Speck*, the photographs were admitted

to prove part of the *corpus delicti* of the murder, as well as to corroborate the testimony of the "life and death" witness, Marcia Alexander. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 143-44.) The evidence was admissible despite the defendant's stipulation that Alexander would properly identify the photographs. As this court noted in *Speck*, wherein the defendant offered to stipulate as to the identity of the deceased girls:

> "the defendant pleaded not guilty and the State had the right to prove every element of the crime charged and was not obligated to rely on the defendant's stipulation." *Speck*, 41 Ill. 2d at 201.

On appeal, the defendant attempts to characterize the photographs, as well as the evidence regarding Joyner's pregnancy, as prejudicial victim impact evidence. However, contrary to his assertion, "every mention of a deceased's family does not *per se* entitle the defendant to a new trial." (*People v. Hope* (1986), 116 Ill. 2d 265, 276.) In support of his contentions, the defendant relies on two appellate court cases. Both cases are distinguishable, and therefore not applicable to the instant case. In *People v. Johnson* (1976), 43 Ill. App. 3d 649, 659, the court held th..t evidence that the complainant and her husband had separated following her rape was harmless given the strength of the State's case. In *People v. Starks* (1983), 116 Ill. App. 3d 384, not only was irrelevant victim impact testimony elicited, but the prosecutor also relied on that testimony in his closing argument. Thus, the evidence concerning Joyner's pregnancy, as well as the photographs of Smith, were properly admitted.

Defendant's final contention of error at the guilt phase of his trial is that the trial court improperly precluded him from arguing during closing argument that he could not have confessed to Benjamin because they were housed in different cell blocks. At trial, defense counsel made the following argument:

"You remember Sergeant Jordan took the stand, he was in charge of the jail at that time and he told you that people in 5 south central have access with each other during certain hours, the cells are open but he also said they were not free to mingle with people from 5 sooth [*sic*] or from other cell blocks so the activity was within the cell block. He also said Derrick Morgan was in 5 south the entire period of time he was there and particularly around Memorial Day when Benjamin was in 5 south central.

[ASSISTANT STATE'S ATTORNEY]: Objection.

THE COURT: Objection sustained, misstating facts in evidence."

Sergeant Jordan actually testified as follows: that inmates from different cell blocks were not allowed to mingle; that in April of 1986, defendant and Benjamin were both housed in Cell Block 5 South Central; and that he had no personal recollection of where, during May of 1986, Benjamin was located. Therefore, since Jordan did not testify that the defendant and Benjamin were in different cell blocks in May of 1986, Benjamin's testimony that he was in the same cell block as the defendant during that time period is uncontradicted. As any argument to the contrary of Benjamin would not have been based upon evidence in the record (or a legitimate inference therefrom), the trial court's ruling that the argument was proper was not only not prejudicial, but it was also manifestly correct. Therefore, we affirm the defendant's murder conviction.

## THE SENTENCING HEARING

The defendant initially contends that he was not eligible for the death penalty because the State failed to prove beyond a reasonable doubt that he committed a "contract" killing. The State argues that it did properly prove the *corpus delicti* of the contract killing.

In order for a defendant to be eligible for the death penalty, the State must prove beyond a reasonable doubt that a statutory aggravating factor exists. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(f).) Accordingly, in this case, the State had to prove that:

> "the defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder \*\*\*." Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(5).

In the instant case, this aggravating factor was shown by Benjamin's testimony that the defendant had admitted that he killed Smith for money. The defendant argues that his admission to Benjamin does not constitute sufficient evidence to prove that a contract killing did occur.

A defendant's confession alone is not enough to prove the *corpus delicti* of a crime. (*People v. Lambert* (1984), 104 Ill. 2d 375, 378.)

> "There must be either some independent evidence or corroborating evidence outside of the confession which tends to establish that a crime occurred. (*People v. Willingham* (1982), 89 Ill. 2d 352, 360.) If there is such evidence, and that evidence tends to prove that the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*." (*Lambert*, 104 Ill. 2d at 378-79.)

However, once there is a showing of corroboration, there is no need to ignore the confession in determining whether the *corpus delicti* has been established. *People v. O'Neil* (1960), 18 Ill. 2d 461, 464.

In this case, the State proved a good deal of corroborating evidence. The State showed that on the day of the murder, defendant's fellow El Rukn accomplices, Evans and Lockridge, came looking for Smith at his apartment; that later that same evening, the defendant

went to Smith's apartment, and the two left together; and that when Smith's body was found 45 minutes later, there were numerous gunshot wounds to the head, and a bag of white powder next to the body. Thus, it is clear that the killer took elaborate steps to ensure that Smith was dead.

The elaborate nature of the crime helped to bolster and explain the defendant's admission to Benjamin: he had Evans, an El Rukn general, oversee the murder; he resorted to trickery to lure Smith to the vacant apartment; and he fired numerous shots into Smith's head to ensure that he would die. After viewing this evidence in a light most favorable to the prosecution, it is clear that the jury could have found that the defendant killed Smith pursuant to a contract, beyond a reasonable doubt. *Young*, 128 Ill. 2d at 48-50.

Defendant next contends that he was denied a fair and accurate sentencing hearing when the jury was allowed to consider testimony that Smith's girlfriend, Lashone Joyner, was pregnant on the night of the murder, as well as photographs of Smith with a woman and three children. The evidence of the pregnancy and all of the life photographs of Smith were admitted during the guilt phase of the trial, and have previously been found by this court to be proper. The jury, at both phases of the sentencing hearing, was properly instructed and allowed to consider the evidence presented at the guilt phase of the trial. Illinois Pattern Jury Instructions, Criminal, Nos. 7B.03, 7C.02 (2d ed. Supp. 1989).

The defendant also raises three errors concerning the State's closing argument at the sentencing phase. The first error that the defendant alleges is that the prosecutor misstated the law by telling the jury that its guilty verdict was dispositive of the issue of whether or not the murder was committed pursuant to a contract. The second point of error is that the prosecutor made improper

comments to the effect that the defendant bore the burden of proving that the murder was not a contract killing. His final contention of error in the prosecutor's closing argument is that he argued that the defendant "enjoyed" killing people.

These alleged errors have all been waived because the defendant failed to object at trial or raise the issues in his post-trial motion. (*Fields*, 135 Ill. 2d at 59-60.) Furthermore, the issue will not be addressed as plain error because, as we have already found, the evidence in this case is not closely balanced, and the alleged errors are not of such magnitude as to have denied the defendant a fair sentencing. *Young*, 128 Ill. 2d at 47.

The defendant next asserts that he was denied a fair sentencing hearing, at both stages, because the trial court excluded the testimony of Barbara Baker and Sergeant Clayton Jordan. He claims that Baker would have testified that she saw Elbert Dunnigan threaten Smith, with a gun, one week before the killing. He also claims that Jordan would have testified that Dunnigan and Benjamin were housed in the same cell block at the LaPorte County jail. The defendant asserts that this testimony would bolster his theory that Dunnigan had somehow persuaded Benjamin to falsely implicate him. He argues that this evidence was relevant at both stages of his sentencing hearing, because it tends to show his innocence.

At the first stage of a sentencing hearing, only evidence having a direct impact on the statutory prerequisites for the death penalty should be admitted. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 371.) A defendant's evidence that someone else committed the crime with which he is charged should be excluded if it is too remote (*Ward*, 101 Ill. 2d at 455), or if it is too speculative (*Dukett*, 56 Ill. 2d at 450).

As defendant admits, both pieces of evidence go to the question of whether or not he actually committed the

crime, and not whether any aggravating factors for the death sentence exist. Thus, due to the nature of the evidence, the trial court did not abuse its discretion in not allowing the defendant to present it at the first stage of his sentencing hearing.

The defendant further argues that he should have been permitted to offer this evidence at the second stage of his sentencing hearing so that the jury could consider "residual doubt." Defendant's position, concerning "residual doubt," is not supported by the case, as this court recently noted:

> "[T]he Supreme Court specifically rejected the claim that defendants convicted of capital crimes have a constitutional right to demand that the jury consider 'residual doubts' over guilt at the sentencing phase. [Citation.] The Court stated that 'residual doubt' over a defendant's guilt is not a 'mitigating circumstance' because it is not a fact about the defendant's character or the circumstances of his crime which may call for a penalty less than death. Accordingly, the Court concluded that the rule that a sentencer may not be precluded from considering any relevant mitigating circumstance did not require consideration of 'residual doubt' over defendant's guilt at the sentencing hearing." *Fields*, 135 Ill. 2d at 67, citing *Franklin v. Lynaugh* (1988), 487 U.S. 164, 172, 101 L. Ed. 2d 155, 165, 108 S. Ct. 2320, 2327.

This evidence was properly excluded at the guilt phase of the trial. Thus, according to the aforementioned principles, the trial court did not act improperly in not allowing the jury to hear this highly speculative evidence at the second stage of the sentencing hearing.

The defendant next argues that his sentence should be vacated and his cause remanded for a new sentencing hearing because the trial judge, during *voir dire*, misled the jurors into believing that they would not actually be sentencing the defendant to death, by informing the

venire that they would only "recommend" the death penalty.

The same issue came before this court in *People v. Perez* (1985), 108 Ill. 2d 70, where the defendant argued that his death sentence should be reversed because the trial court "repeatedly" misinformed the jurors that they would "recommend" whether the death penalty should be imposed. The court noted that the record did not support an inference that the jurors were misled into believing that the responsibility for imposing the death penalty lay elsewhere. The jurors were informed (both verbally and in written instructions) that if they sign the verdict form, the trial court *must* sentence the defendant to death. *Perez*, 108 Ill. 2d at 90-91.

The defendant argues that *Perez* is distinguishable because, in that case, the defense had defaulted its claim that the trial court had improperly used the term "recommend" during *voir dire*. (*Perez*, 108 Ill. 2d at 91.) However, the principles of *Perez* are applicable to the facts of this case. In this case, the trial court never used the word "recommend" during either the first or second stage of the sentencing hearing. Furthermore, the jury was instructed (both orally and in writing) that the verdict would read as follows:

> "We the Jury unanimously find that there are no mitigating factors sufficient to preclude imposition of a death sentence.
>
> The Court shall sentence the defendant, Derrick Morgan, to death ***."

The trial court used the term "recommend" only during *voir dire*, and not at the sentencing hearing. The trial court also made numerous statements during the *voir dire* to the effect that the members of the venire may be required to determine whether the defendant should be sentenced to death. Thus any error that the

trial court may have made was cured by its subsequent actions.

The defendant next argues that he was denied the right of allocution at sentencing. This court has held that there is no right to allocution during the second stage of the sentencing hearing. (*People v. Gaines* (1981), 88 Ill. 2d 342, 374-79.) Defendant offers no reason why this court should overrule *Gaines*, and we decline to do so.

Defendant also asserts that his rights to a fair sentencing hearing were denied when the prosecution was allowed to give opening and rebuttal closing arguments at the second stage of the sentencing hearing. This procedure is proper and does not violate any of defendant's constitutional rights. *People v. Williams* (1983), 97 Ill. 2d 252, 302-03.

The defendant also contends that he was denied an impartial jury when the trial court refused to ask potential jurors if they would automatically impose the death penalty if they found the defendant guilty. During jury selection, the defendant requested that the trial court ask prospective jurors: "If you found Derrick Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are?" The trial court denied this request.

This court has already held that "there is no 'reverse-*Witherspoon*' rule that requires the trial court to 'life qualify' a jury to exclude all jurors who believe that the death penalty should be imposed in every murder case." (*Brisbon*, 106 Ill. 2d at 359.) Further, the defendant has not demonstrated, or even suggested, that any of the actual jurors on his jury were biased towards the death penalty. *People v. Caballero* (1984), 102 Ill. 2d 23, 46.

Defendant contends that the questions regarding bias must include the "life qualifying" or "reverse-*Witherspoon*" question, pursuant to *Ross v. Oklahoma* (1988), 487 U.S. 81, 101 L. Ed. 2d 80, 108 S. Ct. 2273. In *Ross*,

a prospective juror stated that he would automatically vote for the death penalty if the defendant were found guilty. The trial court refused to excuse the prospective juror for cause, and the defendant used a peremptory challenge to remove the prospective juror from the panel. (*Ross*, 487 U.S. at 83-85, 101 L. Ed. 2d at 86-87, 108 S. Ct. at 2276.) The Court found that although it was error not to excuse that potential juror for cause, the death sentence need not be reversed, as there was no showing that any *juror* on the defendant's jury was *actually* shown to be impartial. *Ross*, 481 U.S. at 91, 101 L. Ed. 2d at 92, 108 S. Ct. at 2280.

In this case, the defendant's jury was selected from a fair cross-section of the community, each juror swore to uphold the law regardless of his or her personal feelings, and no juror expressed any views that would call his or her impartiality into question. Thus, as there was no showing that any actual juror on the defendant's jury was partial, the sentence is valid.

The defendant next contends that it was prejudicial error for the trial court to instruct the jury that mere sympathy should not influence its sentencing decision. The defendant argues that, because his entire case in mitigation shows that he is a sympathetic individual and the mitigating evidence was presented to engender sympathy, the instruction effectively precluded the jury from considering mitigation evidence.

The defendant has waived his right to challenge the propriety of the sympathy instruction by failing to object to the instruction at trial, or in his post-trial motion for a new trial. (*Fields*, 135 Ill. 2d at 73-74.) Moreover, the United States Supreme Court has recently considered the same issue. In *Saffle v. Parks* (1990), 494 U.S. 484, 108 L. Ed. 2d 415, 110 S. Ct. 1257, the defendant had presented mitigating evidence for the sole purpose of eliciting sympathy from the jury, and the trial court sub-

sequently informed the jury that it was not to be influenced by sympathy. The jury then sentenced the defendant to death. (*Saffle,* 494 U.S. at 487, 108 L. Ed. 2d at 423, 110 S. Ct. at 1259.) Because that case came to the Court on collateral *habeas corpus* review, the Court did not reach the merits of the defendant's argument, finding that he was not entitled to relief because his claim would mandate a new rule that cannot be applied retroactively. *Saffle,* 494 U.S. at 494, 108 L. Ed. 2d at 428-29, 110 S. Ct. at 1263.

In *dictum* discussing the defendant's underlying claim, the Court noted:

> "Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our long-standing recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary." (*Saffle,* 494 U.S. at 493, 108 L. Ed. 2d at 427, 110 S. Ct. at 1262.)

We adopt the Supreme Court's reasoning and conclude, as has been concluded before (see *Fields,* 135 Ill. 2d at 74), that there is no error in the continued use of the sympathy instruction.

The defendant also argues that he was denied a fair sentencing hearing when the prosecution was allowed to present evidence of crimes that he had been charged with, even though he had not been convicted of the crimes. This court has recently addressed this issue and has held that evidence of prior criminal conduct is admissible at a sentencing hearing, even though it was not adjudicated, if it is relevant, reliable, and subject to cross-examination. (*Thomas,* 137 Ill. 2d at 547.) As the evidence in this case fit the aforementioned requirements, it was not error for it to be admitted.

## CONSTITUTIONALITY OF THE DEATH PENALTY

The defendant initially argues that the Illinois death penalty statute is unconstitutional because it places the burden of persuasion on the defendant to come forward with mitigating evidence. This court has held that the statute does not unconstitutionally place a burden upon the defendant to come forward with mitigating evidence. See, *e.g., People v. Whitehead* (1987), 116 Ill. 2d 425, 465.

The defendant argues that *Whitehead* conflicts with *People v. Olinger* (1986), 112 Ill. 2d 324, and *People v. Del Vecchio* (1985), 105 Ill. 2d 414. These cases are not in conflict. Rather, in both of those cases, this court simply reiterated, and held constitutional, the rule that once the State establishes the existence of statutory aggravating factors, the defendant then has the burden to come forward with evidence in mitigation sufficient to preclude a sentence of death. *Olinger,* 112 Ill. 2d at 351; *Del Vecchio,* 105 Ill. 2d at 445-46; see also *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 998 (finding that the Illinois death penalty statute does not unconstitutionally place a burden on a defendant to come forward with evidence in mitigation).

The defendant also contends that the death penalty statute is unconstitutional because it does not adequately minimize the risk of arbitrary and capricious imposition of the death penalty. He points to a number of different factors that, he argues, render the statute unconstitutional. This argument was raised and rejected in *Fields,* 135 Ill. 2d at 75. The defendant simply asks that this line of cases be reconsidered and he has not presented this court with a persuasive argument that would warrant a reversal of *Fields* or any other decision. Therefore, we decline to reconsider this issue.

The defendant also argues that, while various aspects of the Illinois death penalty statute have been found individually constitutional, the cumulative effect of all of the aspects is to render the statute unconstitutionally arbitrary and capricious. This court rejected this argument in *People v. Thomas* (1990), 137 Ill. 2d 500, and the defendant presents nothing new here to persuade us to reconsider. See also *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 990-1001 (rejecting a facial attack on the Illinois death penalty statute).

## DEFENDANT'S *PRO SE* POST-TRIAL MOTION

Defendant's final contention is that the trial court erred in not appointing new counsel to investigate his post-sentencing motion for a new trial. In his *pro se* motion for a new trial, the defendant alleged that he had received ineffective assistance of counsel because his attorneys had failed to determine whether Benjamin was a paid informant. At the post-trial hearing, defendant's attorneys admitted that they did not determine whether Benjamin was a paid informant, and they sought to withdraw from the case, and requested that the trial court appoint a new attorney to investigate the defendant's ineffectiveness claims.

There is no *per se* rule requiring a trial court to appoint new counsel every time a post-trial motion includes an allegation of ineffective assistance of counsel. (See, *e.g., People v. Brandon* (1987), 157 Ill. App. 3d 835, 846.) Whether an actual conflict exists is determined by the underlying allegations of ineffectiveness, and a trial court's determination that a claim is spurious will not be overturned unless it is manifestly erroneous. *Brandon*, 157 Ill. App. 3d at 846-47.

In denying the defendant's motion, the trial judge stated:

> "I think that the job that the defense attorneys have preformed in their duties with reference to this case is not questionable, the evidence is quite direct and uncontradicted; and accordingly, I am not going to conjecture on possibilities or facts that are not matters which could be reasonably inferred from the facts involved herein.
>
> We can manufacture any type of case we want to in hindsight. In foresight the facts do not justify any such conclusion."

The trial judge also noted that there was no hint of evidence that Benjamin was a paid informant. In fact, he felt that the argument was nothing more than a "smokescreen." The defendant did not allege any new facts that would tend to show that Benjamin was paid. Accordingly, appointment of new counsel would have been wasteful and futile. See *People v. Dudley* (1970), 46 Ill. 2d 305, 310.

A trial court's findings in this matter will not be reversed unless found to be manifestly erroneous. (*Brandon*, 157 Ill. App. 3d at 847.) Since there was no evidence anywhere in the record that even tended to show that Benjamin was a paid informant, we cannot find that the trial court's failure to appoint new counsel to investigate the allegations was manifestly erroneous.

For the reasons stated, we affirm the defendant's conviction and sentence for murder. The clerk of this court is directed to enter an order setting Wednesday, May 15, 1991, as the date on which the death sentence, entered in the circuit court of Cook County, is to be carried out. Defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center,

and the warden of the institution in which the defendant is confined.

*Judgment affirmed.*

JUSTICE BILANDIC took no part in the consideration or decision of this case.

JUSTICE CLARK, dissenting:

Because the State failed to meet its burden of proof with respect to the existence of a statutory aggravating factor, and because the prosecutor made erroneous comments during his arguments at the sentencing hearing, I would vacate defendant's death sentence.

In order to enhance a murder to a capital offense, the State must prove beyond a reasonable doubt that an aggravating factor exists. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b).) In this case, the State attempted to prove that the murder was committed pursuant to a contract. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(5).) The only evidence the State presented to meet its burden with respect to the aggravating factor is Benjamin's testimony regarding defendant's confession to him. While the confession is adequately corroborated with respect to the commission of the murder itself, there is no evidence to corroborate the State's claim that defendant was hired to commit the murder.

As the majority notes, the State produced enough evidence to corroborate certain statements contained in defendant's confession. For example, the details in defendant's confession are consistent with the name of the victim, the location of the shooting, the presence of a bag of flour, the presence of Evans and Lockridge, and the number of shots fired. These facts sufficiently corroborate defendant's confession, such that the confession, when taken as a whole, supports defendant's conviction for murder.

However, when considered individually, not every statement contained in defendant's confession to Benjamin is consistent with other evidence. In fact, at least one statement is directly contradicted by the physical evidence in the case. According to Benjamin's testimony, defendant stated that he used a .357 pistol in the killing. Although there was no direct testimony regarding the caliber of bullets removed from the victim, testimony tends to show the bullets could not have come from a .357 pistol. The pathologist who performed the autopsy on the victim's body testified that the victim's head was intact, that there were five bullet entry wounds but no exit wounds, and that six bullets were removed from the victim's body. Two of the bullets entered the victim through the same entry wound, which indicates that the shots were fired from an extremely close range. This testimony indicates that the bullets did not come from a large caliber gun, such as a .357 pistol. It is inconceivable that the victim's head would be left intact if the victim received six shots from a .357 pistol at close range. Moreover, a gun that powerful could be expected to produce exit wounds. Therefore, the manifest weight of the evidence shows that, contrary to defendant's statement in his confession, a .357 pistol was not used in the murder.

The fact that a .357 pistol was not used in this murder does not of course mandate a reversal of defendant's conviction. Rather the fact defendant lied with respect to this portion of his confession points out that he may have also lied with respect to the money he was to receive for the killing. If, as the State argues, defendant was boasting of his crimes in order to enhance his status among his fellow inmates, it is very possible that he embellished the facts to enhance the story. This is one possible explanation for the inaccurate description of the gun used. Indeed the State specifically argues that

defendant "in all likelihood was boasting about the size of the gun he used." Such an explanation can be applied equally to that portion of the confession dealing with the contract. That is, defendant may have lied about the contract in order to enhance his status among fellow inmates.

The fact defendant's confession contained lies is especially relevant because the State produced *no evidence* to corroborate the specific statement that defendant was to receive money for his role in the murder. Given the fact that at least one other statement in the confession was false, I believe the State had the burden of producing evidence to corroborate the individual statement regarding the contract. Because no such evidence was produced, I believe a reasonable doubt exists as to whether the murder was committed pursuant to a contract. Therefore, I would reverse defendant's death sentence.

As support for their finding that the State met its burden, the majority relies on evidence of the steps taken to lure the victim to a vacant apartment, the number of shots fired into the victim, and the fact an El Rukn general witnessed the killing. The majority contends these facts support a finding that the murder was committed pursuant to a contract. This reasoning is tenuous at best. This evidence supports a finding that the murder was premeditated, that defendant had accomplices who may have witnessed the murder, and that defendant took steps to avoid detection. However, it does not in any way indicate the motive for the killing, or that defendant received money for the murder.

In addition to the lack of evidence to corroborate the existence of a contract, numerous statements by the prosecutor during his closing argument at the first phase of the sentencing hearing warrant reversal of the death sentence. The majority concludes that defendant waived objections to these errors because he did not object at

trial or include the errors in a post-trial motion. Moreover, the majority concludes that the errors were not plain error because the evidence was not closely balanced. (142 Ill. 2d at 466.) Because I believe the evidence was closely balanced with respect to the existence of a contract, I would apply the plain error doctrine and review the alleged errors. *People v. Young* (1989), 128 Ill. 2d 1, 47.

The erroneous arguments arose in the sentencing hearing, which is a proceeding separate from the guilt or innocence phase of the trial. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(d).) Therefore, the only relevant question is whether the evidence was closely balanced with respect to the existence of a contract. The fact that the confession was corroborated in respects other than the existence of a contract is irrelevant to a determination of whether the evidence was closely balanced in regard to the aggravating factor.

During its opening argument at the sentencing hearing, the State argued that the jury's guilty verdict was equivalent to a finding that the murder was committed pursuant to a contract. Specifically the State argued:

> "With regard to the second propositions, second issue, whether or not the defendant committed the murder as a result of a contract agreement or an understanding whereby he was to receive money, this you have already decided in your guilty verdict. By your guilty verdict you have told the witnesses who were on the stand that, 'We believe those witnesses and we believe what they say.' So, don't go back there and try to rehash your own guilty verdict.
>
>    \*\*\*
>
> You have already decided these issues. You have already decided the fact that what William Benjamin told you was backed up, re-enforced [*sic*] corroborated by what LaShone Joyner told you, what the medical examiner told you and what the evidence from Peter Poole

and the scene photo showed you. Don't go back and re-hash that, ladies and gentlemen.

You[r] duty is easy at this point. You have already found that the second statutory factor, that being that he was convicted of a murder pursuant to a contract agreement or understanding is in place."

Defendant argues these comments misstate the law in that a guilty verdict does not necessarily encompass a finding that the murder was committed pursuant to a contract. I agree.

Initially, I note that there are certainly instances in which a jury's verdict necessarily means that it has also found the existence of an aggravating factor. For example, it is possible for a jury to convict a defendant with armed robbery and murder arising out of the same incident. In such a case, the jury has necessarily determined that the murder occurred in the course of committing another felony. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(6).) However, in this case no such conclusion may be drawn from the jury's guilty verdict. Motive is not an element of murder, and as such, the jury need not have even considered why the victim was killed. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a).) Therefore, the State's comments that the jury had already decided the issue is not supported by the evidence. At best, these comments could have confused the jurors, and at worst could have misled them.

Defendant contends a second error was made during the State's rebuttal argument when the prosecutor stated: "Why did the murder happen? There was no logical explanation given. Mr. Benjamin's testimony has given the facts and circumstances of the case and it was a contract." Defendant argues that this statement improperly shifted the burden of proof to defendant with respect to the aggravating factor. I agree.

There is a legal presumption that this murder was not committed pursuant to a contract. This is implicit in the fact that the State has the burden of proving beyond a reasonable doubt that an aggravating factor exists. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(f).) Therefore, defendant need not have produced any evidence on the issue. The State's comment implies that because no other "logical explanation" was presented, Benjamin's testimony must be true. Such a comment misstates the burden of proof in this case. The impact of the error is compounded by the fact defendant has maintained throughout the entire proceeding that he did not commit the murder or confess to Benjamin. Accordingly, defendant could not be expected to put on evidence that he had a different motive for the killing.

The combined effect of the State's improper comments may have misled the jury into believing that it had already decided the existence of an aggravating factor, and that defendant had the burden of disproving this factor. Taken alone each of these comments is reversible error. Together the effect is even more apparent. Therefore, I would reverse defendant's death sentence and remand for a new sentencing hearing.

JUSTICE FREEMAN joins in this dissent.